STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JACK ROSS, DEFENDANT-APPELLANT.

Argued February 20, 1979—Decided June 4, 1979.

---

240

*Ms. Yvette Weiss,* Designated Counsel, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Ms. Susan W. Sciacca,* Deputy Attorney General, argued the cause for respondent (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

SCHREIBER, J. The primary issue in this case is whether a trial court at the request of the prosecution may call certain individuals as court witnesses to enable the prosecution to introduce into evidence as substantive proof of the crime oral and written statements previously made by those witnesses, thereby avoiding the limitation of *Evid. R.* 63(1)(a). We hold that it may not. Furthermore, we find that the trial

error was compounded by the trial court's directions and instructions to the jury concerning the veracity of these witnesses and its misuse, as well as misapplication of *Evid. R.* 63(1).

This case is before us by virtue of a dissent in the Appellate Division, *R.* 2:2–1(a). Defendant had been charged with and found guilty of first degree murder while armed on August 24, 1973; possession on January 1, 1974 of a revolver without a permit in violation of *N. J. S. A.* 2A:151–41; and having acquired the revolver without a permit in contravention of *N. J. S. A.* 2A:151–32. He was sentenced to life imprisonment for the murder and a concurrent term of three to five years for the armed feature of the crime. He also received a two to three-year sentence for violation of *N. J. S. A.* 2A:151–41 and a concurrent one to two-year term for violation of *N. J. S. A.* 2A:151–32. These latter sentences were to be served consecutive to the life term. The Appellate Division affirmed, one judge dissenting. 162 *N. J. Super.* 47 (App. Div. 1978).

Before opening to the jury the prosecutor moved that the trial court call as its witnesses four individuals who he asserted had given statements to the police which were inconsistent with what they were now likely to testify to at trial. He then proposed to introduce the hearsay statements under *Evid. R.* 63(1) as affirmative proof of the facts stated therein. Under that rule a witness's prior statement is admissible for both credibility and substantive purposes when offered by a party who is not the witness's proponent. The prosecutor viewed the statements as essential to the State's case.

The State's proofs, other than the statements and testimony of these four witnesses, may be summarized as follows. At about 9:30 P.M. on August 24, 1973, police found Charles Authur Parsons lying on the first floor of an apartment building at 340 Duncan Avenue, Jersey City. He had been shot in the neck, was bleeding profusely and was unable to talk. Taken by ambulance to the hospital, he was dead on arrival. The police traced a trail of blood into the elevator,

picked up the trail on the eleventh floor, and followed it to the apartment of Cecil Hill, Parsons' girlfriend. Hearing loud noises emanating from the apartment across the hall which belonged to Margaret Ross, defendant's sister, the police sought and gained her permission to enter. She had previously telephoned the police to advise them of Parsons' condition and the need for an ambulance. In addition to Margaret Ross, the police found her two children, Felicia, 8 years old, and Charles, aged 11, and her 14-year-old brother, Charles Ross. Also present were Cecil Hill and her 5-year-old son, Welton Palmer.

The police, having been given Cecil Hill's consent, searched her apartment. There they found blood on the floor and walls of the living room, bedroom, kitchen and bathroom. The police returned to the Ross apartment to search it further and interrogate the occupants. At that time Felicia and Welton made some comments concerning the shooting. The prosecutor wanted to place those oral statements, among others, in the record.

Later that night the police interrogated Cecil Hill at police headquarters and obtained a signed statement from her. Three days later they interrogated her again at police headquarters. While this interrogation was going on, her son Welton made some further remarks concerning the incident. The prosecutor sought to introduce Welton's oral statement as well as the written statements of Hill. Subsequently Margaret Ross gave the police a written statement.

These, then, are the six hearsay statements which the prosecutor sought to use as part of his proofs: the two written Cecil Hill documents, Margaret Ross's written statement and the oral remarks of the children Felicia and Welton.

The State also showed that on the following New Year's day, January 1, 1974, a police officer observed defendant standing on a street corner near the Duncan Avenue apartment house holding a paper bag. When the officer saw defendant drop the bag and begin to walk away, he stopped defendant, requested identification and retrieved the bag. In-

side was a .22 caliber revolver. The ballistics indicated that the bullet which killed Parsons had been fired from that gun.

The prosecutor claimed that the murder charge could not be sustained without the substantive effect of the six hearsay statements. Despite the objection of defense counsel that the "jury may get a wrong impression from the fact they are called as court witnesses," the trial court held that it would conduct a hearing pursuant to *Evid. R.* 8 to determine whether the prosecutor was justified in not "vouching" for the credibility of Cecil Hill, her son Welton, Margaret Ross and her daughter Felicia. If so justified, the court would then call these four as court witnesses. Thereupon, each testified outside the presence of the jury.

Cecil Hill explained that she had known defendant when they both resided in Virginia, and that when she came to Jersey City, she had lived with defendant's sister Margaret Ross. Subsequently she and defendant lived together. About two years before August 1973, defendant and she had separated. During the past several months Parsons had been her boyfriend.

Hill also testified that on the evening of the shooting Parsons had joined her in the apartment for supper. After supper Welton had gone across the hall to Margaret Ross's apartment to watch television with Felicia. At about 7:00 P.M., while Parsons was watching television, Cecil went to Margaret's and visited for about a half hour. She then walked to a neighborhood delicatessen to buy a soda. Upon returning to the apartment building, she walked up the stairs to the eleventh floor and discovered Parsons lying near the elevator and bleeding extensively. She ran to Margaret's apartment to call an ambulance. Hill was extremely distraught and Margaret did the telephoning. When the police arrived, Hill accompanied them to her apartment, and later to police headquarters where she gave them a statement which was reduced to writing and signed by her. She claimed she had not seen defendant that day and that she did not know who shot Parsons.

Her testimony was consistent with the written statement. However, it contradicted in many respects a signed statement given to the police three days later on August 27 at police headquarters. In the second statement she acknowledged that on the night in question when she was in Margaret's apartment, the defendant arrived and asked her where Parsons was because he wanted to talk with him about Cecil. She responded that Parsons was in her apartment. The statement also recited that Hill saw the defendant knock on her door and she then closed Margaret's door. She heard a shot. Defendant returned to Margaret's apartment and said to Cecil, "I should shoot you." Cecil screamed and ran into the bathroom, shutting the door behind her.

At the hearing Cecil admitted making the August 27 statement but disclaimed its accuracy. She claimed that she had frabricated the story because the police were continuously badgering her and she wanted to get them off her back.

Welton, who was 5 years old at the time of the murder and was eight at the time of the hearing, testified that he could not remember any relevant details about the night in question, except that he had seen defendant in Margaret's apartment. He further stated that if he had previously given information to the police, it would have been the truth. According to one of the police officers, Welton had stated on the night of the killing that defendant had shot Parsons. Welton had also indicated that immediately after the shooting defendant had run into Margaret's apartment and threatened to shoot Cecil. Another officer testified that Welton made similar statements when his mother was being interrogated at police headquarters on August 27.

Margaret Ross's testimony tracked Cecil's. Cecil had entered Margaret's apartment at about 7:00 or 7:30 P.M., stayed awhile, and left. Margaret had not seen defendant that evening. Nor had she seen or heard anything unusual until Cecil pounded on her door urging her to call an ambulance. She phoned the police and then walked down the hall to Parsons. He mumbled incoherently and she replied that

an ambulance was on its way. She returned to her apartment. Margaret Ross had also given the police a signed statement. However, its contents were consistent with her testimony.

Finally, Felicia, Margaret's daughter, testified that she had not seen defendant on the night in question nor had she seen or heard anything unusual until the police arrived on the scene. This was inconsistent with Felicia's oral response to the police on the night of the shooting that defendant had shot Parsons.

Following the Rule 8 hearing the trial court found that all four witnesses were or had been closely related to defendant and that they were all present at the time and in the vicinity of the shooting. It further found that the witnesses "conveniently" did not remember things which might have incriminated defendant and that all four were hostile to the State's position. The court concluded that, in the interest of producing all the vital facts before the jury, the four should be called as court witnesses.

The testimony adduced before the jury was virtually the same as that produced on the Rule 8 hearing. The four court witnesses testified and their written and oral prior out-of-court statements were admitted, not only with respect to credibility but also for their substantive truth. Various Jersey City police officers and detectives, a state police officer ballistics expert, and a medical examiner also testified. The tale that evolved has been essentially described above.

## I

Our hearsay rule (*Evid. R.* 63) provides generally that "[e]vidence of a statement offered to prove the truth of the matter stated which is made other than by a witness while testifying at the hearing" is inadmissible unless falling within one of the stated exceptions. One exception is found in *Evid. R.* 63(1):

> A statement is admissible if previously made by a person who
> is a witness at a hearing * * * and the statement:
>   (a) Is inconsistent with his testimony at the hearing * * * except
> that such a statement may be admitted if offered by the party calling
> the witness only as permitted by Rule 20 * * *.

*Evid. R.* 20, which is incorporated in *Evid. R.* 63(1), prescribes that the proponent of a witness may introduce a prior contradictory statement only to neutralize the witness's testimony, provided that the judge has found the party has been surprised. *State v. Gallicchio,* 44 *N. J.* 540, 545 (1965).

■ Thus a party who calls the witness cannot introduce the witness's prior statement as substantive evidence. However, when the statement is inconsistent with the witness's testimony at the hearing and is offered by a party who has not called the witness, the statement may then be considered and weighed as proof of the truth of its substance. See *State v. Provet,* 133 *N. J. Super.* 432, 437 (App. Div.), certif. den. 68 *N. J.* 174 (1975); *State v. Hare,* 139 *N. J. Super.* 150, 156 (App. Div.), certif. den. 70 *N. J.* 525 (1976).

■ It is well settled that a court possesses the inherent power to call witnesses on its own initiative in the quest for the truth. This is the general rule, see 9 *Wigmore, Evidence* § 2484 (3d ed. 1940), and its salutary purpose is obvious. Mr. Justice Frankfurter cogently and emphatically admonished that

> [a] trial is not a game of blind man's buff; and the trial judge —
> particularly in a case where he himself is the trier of the facts upon
> which he is to pronounce the law — need not blindfold himself by
> failing to call an available vital witness simply because the parties
> for reasons of trial tactics, choose to withhold his testimony. [*Johnson v. United States,* 333 *U. S.* 46, 54, 68 *S. Ct.* 391, 396, 92 *L. Ed.* 468, 474–475 (1948) (Frankfurter, J., dissenting)]

This general principle has been followed in New Jersey. See, *e. g., Band's Refuse Removal, Inc. v. Bor. of Fair Lawn,* 62 *N. J. Super.* 522, 547 (App. Div.), supplemented 64 *N. J.*

*Super.* 1 (App. Div.), certif. den. 33 *N. J.* 387 (1960), and cases cited. See also *Tp. of Wayne v. Kosoff,* 73 *N. J.* 8 (1977), holding a court has the inherent power to call a witness as an expert.

However, the discretionary authority to call witnesses does not justify nullification of a duly adopted evidence rule. Our research has not disclosed any case sanctioning this technique for admitting into evidence a prior inconsistent statement of a court witness for substantive proof of the facts stated therein.[1] Here, the trial court's action circumvented *Evid. R.* 63(1) (a) and violated its spirit and intent.

Furthermore, the trial court's action was inconsistent with its role as an impartial arbiter. Although a trial court may participate in assisting the jury in the search for truth by supplementing counsels' questioning of witnesses, *State v. Riley,* 28 *N. J.* 188, 200 (1958), or indeed by its calling of witnesses, the trial court should not become a participant

---

[1]The only case which seemingly would appear to support that proposition is *Patterson v. State,* 275 *Md.* 563, 342 *A.* 2d 660 (1975), aff'g 22 *Md. App.* 13, 321 *A.* 2d 544 (Ct. Spec. App. 1974), in which prior inconsistent statements made by the court witness were admitted into evidence without any instruction that their use be limited to impeachment purposes. Defense counsel had made no objection at trial and the appellate court refused for that reason to consider the issue. 22 *Md. App.* at 21, 22, 321 *A.* 2d at 545, 548–549.

This method has been used to permit the State or the defendant to utilize an inconsistent statement to attack the witness's credibility. See, *e. g., Gholston v. State,* 338 *So.* 2d 454, 456, 458–459 (Ala. Cr. App. 1976) ; see generally 3A *Wigmore, Evidence* § 918 at 720 & n. 3 (Chadbourn rev. 1970) (citing cases which have permitted the calling of court witnesses to avoid a rule precluding impeachment of a party's own witness). *Cf. State v. Singleton,* 158 *N. J. Super.* 517 (App. Div.), certif den. 79 *N. J.* 470 (1978) (trial court's action in calling an eyewitness who had recanted a previous statement held proper where the State's prima facie case was established through other evidence) ; *State v. Chaney,* 160 *N. J. Super.* 49 (App. Div.), certif. den. 78 *N. J.* 405 (1978) (court called a key witness who was the only eyewitness to a fatal shooting and whose testimony was consistent with her statement on the crucial matter).

on behalf of either party. *State v. Ray,* 43 *N. J.* 19, 24–25 (1964). As Justice Proctor put it in *Village of Ridgewood v. Sreel Investment Corp.,* 28 *N. J.* 121 (1958):

> There is a point at which the judge may cross that fine line that separates advocacy from impartiality. When that occurs there may be substantial prejudice to the rights of one of the litigants. [28 *N. J.* at 132].

■ Here, the prosecutor conceded that the statements were essential to establish the State's prima facie case, and that, because of the strictures of Rule 63(1), he could not introduce them *as part of the State's case* unless the witnesses were called by the trial court. Only in that manner could the State's case be proven. In acceding to this request the trial court became an active participant with the prosecutor in presentation of a prima facie case for the State. It overstepped the bounds of objectivity.

## II

In attempting to comply with the prosecutor's request, the trial court was led into additional errors in its directions and instructions to the jury. It was self-evident that the testimony of Cecil Hill and Margaret Ross supported defendant's position that he was not guilty. Clearly the credibility of these witnesses could play a vital role in the defense. Yet the trial court, before any witnesses were called, cast a deep shadow, to say the least, over the believability of these witnesses.

After advising the jurors that Cecil, Welton, Margaret and Felicia would be called as court witnesses, the trial court explained that *"neither side,* neither the Prosecutor *nor the defense,* [would certify] as to the credibility or believability" of these witnesses. (Emphasis supplied). The prejudicial impact of this explanation to the jury was aggravated when defendant on his case called Cecil Hill, her son Welton, and Margaret Ross. The trial court had warned defense

counsel that by putting them on the witness stand he was vouching for their credibility and the trial court "was not going to allow you [defense counsel] to put them on and say in one breath they are credible and in the next breath they are not credible." This, even though defendant had objected from the outset to the State's motion, and had never questioned the testimonial credibility of Cecil Hill and Margaret Ross at the Rule 8 hearing or before the jury.

When Cecil Hill took the stand as a defense witness, the trial court instructed the jury that she had previously been called as a court witness because "each side did not vouch for her credibility" but that by calling her as a defense witness the defense was now "vouching for her credibility." The trial court reminded the jury again of the change in defendant's opinion of the credibility of the witnesses when Margaret Ross and Welton testified. The same theme was reiterated in the jury charge, namely that the court had called the four witnesses because neither side would vouch for their credibility "but that subsequently when defense counsel had called them as his witnesses, "he was bound by their answers" and "he was certifying to their credibility, as far as those answers were concerned."

The trial court erred in these comments and instructions to the jury. It failed to recognize that the defense had objected to the procedure of having the court call the witnesses as its own and had never questioned their credibility. The Rule 8 hearing, held to determine whether the prosecutor was justified in not calling these witnesses, could not be the basis for infringing on defendant's rights to produce these witnesses or to contend that their testimony as court witnesses was truthful. The trial court's comments and instructions to the jury sharply and unjustifiably curtailed these rights and impermissibly interfered with the jury's role in assessing credibility.

Furthermore, its claim that defendant "was bound" by his witness's testimony is not supportable either for policy

reasons or by precedent. To hold that a party must accept a witness's testimony fails to recognize that a witness may be mistaken, may change his position, or may have forgotten. A primary purpose of the trial process is to ascertain the truth and a needless limitation that a party is "bound" by some particular answer or answers of a witness he has called would impinge upon that proper end. Such a limitation has long since been discarded. As long ago as 1811 Lord Chief Justice Ellenborough wrote:

If a witness is called on the part of the plaintiff, who swears what is palpably false, it would be extremely hard if the plaintiff's case should for that reason be sacrificed. But I know of no rule of law by which the truth is on such an occasion to be shut out, and justice is to be perverted. [*Alexander v. Gibson*, 2 *Campbell* 555, 556–557, 170 *Eng. Rep.* 1250 (K. B. 1811)]

See generally discussion in 3A *Wigmore, Evidence* §§ 897–898 (Chadbourn rev. 1970). New Jersey has adhered to this view. See, *e. g., DeRienzo v. Morristown Airport Corp.*, 28 *N. J.* 231, 240 (1958) ; *Schreiber v. Public Service Ry. Co.*, 89 *N. J. L.* 183, 186 (E. & A. 1916) ; *Ingersoll v. English*, 66 *N. J. L.* 463 (Sup. Ct. 1901).

It is true that when a party calls a witness to the stand, there is an implied representation that the expected testimony is worthy of some credit. *State v. Holley*, 34 *N. J.* 9, 13, cert. den. 368 *U. S.* 854, 82 *S. Ct.* 89, 7 *L. Ed.* 2d 51 (1961). But this does not constitute a guaranty that the testimony will be credible in whole or in part. Recognition that a party is not bound by his witness's testimony subverts the very idea of a guaranty. The purposes served by not being bound by a witness's testimony are equally applicable for rejecting the notion that a party vouches for the witness's credibility. Jeremy Bentham's analysis strikingly demonstrates the defect in that latter notion. He wrote:

The false axiom is this: — "All men belong to one or other of two classes — the trustworthy and the untrustworthy. The trustworthy never say anything but what is true: by them you never can be de-

ceived. The untrustworthy never say anything but what is false; so sure as you believe them, so sure are you deceived." [6 *Bentham, Rationale of Judicial Evidence* 401 (Bowring ed. 1827), quoted in 3A *Wigmore, supra,* § 898 at 663]

A party does not warrant or assure that each and every part of a witness's testimony will be credible. To instruct the jury to that effect is unsound.

As we have previously observed, even when the witness's prior statement is being offered by the adverse party, the statement would have to be in conflict with the witness's testimony. Yet, here, at the conclusion of the Rule 8 hearing it was obvious that both Ross's written statement and Hill's initial written statement were consistent with their testimony. There were other fatal errors also in admitting the oral comments of the two children, Felicia and Welton. Both were claimed to have said that defendant shot Parsons. But there was no doubt that neither child saw any shooting. These conclusory remarks which were reiterated on several occasions before the jury would not have been admissible if made at the trial by Felicia or Welton in the absence of a necessary foundation that they saw the event.

Further, Welton reportedly said that he saw defendant enter the Ross apartment immediately after the shooting and threaten Cecil Hill. Welton testified that he did not remember having made these statements. Admissibility of these statements might fall within the scope of Rule 63(1) (b) which covers the situation where the witness has an insufficient present recollection of particular facts (the inconsistency element of paragraph (a) being absent) and the writing contains a recital of those facts. To be admissible the writing had to be recorded when the event actually occurred or was fresh in the witness's memory, was made by the witness or under his direction, or by some other person for the purpose of recording it and is offered after the witness testifies that the statement was true in fact. Rule 63(1) (b) recites what is commonly known as the doctrine of past

recollection recorded and fills an evidential gap when the witness's memory has failed. See *State v. Bindhammer,* 44 *N. J.* 372, 385–386 (1965). It might be noted that a proper foundation was not established in that there was a failure to demonstrate when and under what circumstances the writing was prepared. Moreover, the writing was not introduced in evidence in whole or in part.

As stated above, Rule 63(1)(a) permits only a party who is cross-examining the witness to introduce into evidence a prior inconsistent statement for the purpose of establishing the truth of the contents of the statement. On September 15, 1978 the Court adopted an amendment to the rule to be effective, July 1, 1979, which would have eliminated the limitation so that the party calling the witness could also place the prior inconsistent statement into evidence as substantive proof. See "Report of Supreme Court Criminal Practice Committee," 101 *N. J. L. J.* 434, 437–438 (1978). We have entered an order dated May 9, 1979 staying the effective date of the proposed rule change pending our further review. Whether such a modification may be made in the future in no way justifies what occurred here.

### III

The judgment of convictions for wrongful possession and acquisition of a revolver rest upon substantially different evidence from that concerning the murder. They relate to an incident which occurred more than four months after the homicide, and the credibility of defendant's witnesses played no part in the jury's sifting the pertinent evidence. In fact, defendant does not claim any error with respect to those convictions. Accordingly, the murder conviction is reversed and remanded for a new trial and the convictions with respect to the illegal acquisition and possession of the gun are affirmed.

*For affirmance in part and reversal in part*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*Opposed*—None.