177 N.J. Super. 47 (1980)
424 A.2d 1182
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN T. SONEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted November 5, 1980.
Decided November 26, 1980.
*50 Before Judges MATTHEWS, MORGAN and MORTON I. GREENBERG.
Stanley C. Van Ness, Public Defender, attorney for appellant (Paul H. Feinberg, designated attorney, on the brief).
John J. Degnan, Attorney General, attorney for respondent (Mary Ann Kenny Pidgeon, Deputy Attorney General, on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, J.A.D.
Defendant was indicted and convicted of violation of N.J.S.A. 2A:113-9, willful or wanton death by automobile. He was sentenced to 364 days in the Ocean County Jail. Service of three months of the term imposed was suspended. Defendant was also placed on probation for three years and fined $1,000. He appeals asserting error in the trial and excessiveness in the sentence.
The evidence at the trial showed the following. On May 23, 1976, at about 3 p.m., John Marshall was operating a Toyota pickup truck headed in an easterly direction on Surf Avenue in Beachwood, Ocean County, New Jersey. He had two passengers in his vehicle, his son John Marshall, Jr. and Robert Macknowski. All three were in the cab of the truck. Marshall was driving about 30 miles an hour in a 40-mile zone. The speed was slow because he contemplated turning. Surf Avenue is a fairly straight, level, two-lane road at that point. Traffic was light.
At the same time defendant was driving west on Surf Avenue in his 1976 Mercury Cougar. Since defendant was east of Marshall their vehicles were converging. Defendant was accompanied by his wife and an infant child. The evidence showed that defendant's vehicle was swerving erratically from one side of the road to the other. A witness, Sandra Hand, who was driving east toward defendant, was so concerned about the situation that she pulled over to the side of the road. She said *51 she observed defendant going in a fast speed on both sides of the road. Robert Brindle was operating a vehicle in a westerly direction on Surf Avenue. He testified that he observed defendant in his rear-view mirror moving into the east-bound lane as if to pass him. William Houston was standing in a yard and saw defendant start to pass Brindle. Defendant then swerved onto the east-bound shoulder and then moved back into the east-bound lane. At that point defendant's vehicle hit Marshall's truck practically head-on in the east-bound lane. The impact was seen by both Brindle and Houston. They heard no brake noise from defendant nor did they hear defendant blow his horn. Both thought defendant was going at a high rate of speed. Brindle said Marshall had no way to avoid the accident. The two passengers in the Marshall vehicle were killed in the accident.
Dennis Crump, a corporal and traffic safety coordinator for the Beachwood Police Department, arrived at the scene of the accident at 3:25 p.m. His investigation there showed that defendant's car hit Marshall's truck almost directly head-on in the east-bound lane. He found no evidence that either vehicle braked. Corporal Crump and Sergeant John Wagner met defendant at Community Memorial Hospital where defendant was taken after the accident. The police officers advised defendant of the fatalities, of the possible criminal charge against him, and of his Miranda[1] rights. Defendant then gave a statement to the officers and, at Wagner's request, consented to a blood test to determine whether there was any alcohol, narcotics or barbiturates in his bloodstream at the time of the accident. Dr. Edwardo Saguil, the emergency room physician, removed the blood sample at about 6:48 p.m. and gave it to Crump. The sample was later analyzed at the State Police laboratory and admitted into evidence. In the statement defendant gave no real explanation as to now the accident happened. He said he *52 went around a curve on Surf Avenue and he heard glass and a crash. He stated that he had not been drinking but that he took phenobarbital and dilantin for his nerves at 10 a.m. on that day. He said he did not pass any cars.
Dr. Paritosh De, the supervising forensic chemist at a toxicology laboratory of the State Police Division, was called as a witness by the State. He testified, over objection, that a blood sample would have shown the presence of phenobarbital if defendant had taken his medication after breakfast and lunch on that day. This testimony was significant because the State contended at the trial that the accident was caused by defendant losing control of the vehicle due to an akinetic attack caused by defendant's failure to take medication on the day of the accident. This medication was required because defendant had suffered for many years from a condition which causes such attacks. The drugs forestalled defendant from having attacks. Defendant's objection to the testimony asserted surprise since De had not been listed as a witness before trial in discovery. The record shows, however, that the State had advised the defense of the contents of De's testimony in supplementary discovery during the trial on April 18, 1978. Though the trial judge allowed the testimony, he suggested that defendant find his own expert to testify concerning the absorption rate of the drugs. The trial judge made this ruling on Thursday, April 20, 1978. He said defendant could have the weekend for this purpose.
Over objection of defendant the State introduced evidence of two prior automobile accidents within the six-week period before the accident causing the deaths. In both defendant was operating the vehicle. The first accident was on April 8, 1976. Defendant and Walter Barsnica had been traveling to work at the Elizabeth Post Office in the afternoon. The day was sunny, without rain or fog. While they were on the Garden State Parkway Barsnica was napping. When the Soney vehicle swerved Barsnica awakened and saw a vehicle directly ahead of them. Barsnica yelled at defendant but nevertheless Soney *53 drove the car into the rear of the other vehicle. Barsnica said defendant was in a "daze," but his eyes were open and he had one hand on the steering wheel with his foot on the accelerator. Yet he did not move or respond when Barsnica called his name. After the impact the cars disengaged. Defendant then swerved across lanes of traffic. But he was still pressing on the accelerator. The car crossed the median strip. Barsnica grabbed the steering wheel and shut off the ignition. The vehicle then stopped. Barsnica got out to assess the damage. Defendant then asked what they were doing there. When Barsnica told defendant they had been in an accident defendant denied it. This accident was investigated by Trooper Richard Sebastian of the New Jersey State Police. When Sebastian questioned defendant he was told by him that he did not know how the accident had happened. Barsnica told Sebastian that defendant had either blacked out or fallen asleep.
The second accident was observed by another state trooper, Thomas Herr. Herr testified that on May 5, or May 11, 1976 he was on routine patrol on the Garden State Parkway. At 1:40 a.m. he saw a vehicle move across lanes on the road and then veer to its right. The vehicle went down an embankment and hit a tree. Herr questioned the driver, who was defendant. Defendant told Herr that he could not recall what had taken place.
Defendant's deposition, taken in a civil lawsuit arising from the accident, was part of the State's case. The portions read related to his physical condition and his efforts to get a driver's license. Defendant was represented by different counsel in the criminal and civil proceedings. The affidavit of his civil attorney, George N. Arvanitis, submitted in that case on a motion to seal defendant's deposition, stated that he was not aware of the criminal matter. When defendant testified in the civil case on the deposition he did not plead the privilege against self-incrimination.
Defendant presented eyewitnesses to the May 23, 1976 accident. Roger Hutchins, who was standing in front of his house *54 two blocks from the point of impact, saw defendant driving erratically in the wrong lane. Defendant's vehicle was accelerating. Defendant was looking over his shoulder into the back seat before the impact. Hutchins saw the impact. Lisa Dariengo, who was a pedestrian in the area, saw the collision and saw the occupants thrown from the vehicle.
Dr. Thomas Fitch was called by defendant as a witness on his behalf. He testified that he had been defendant's physician from 1953, when defendant was five years old, until 1972 when he, Fitch, retired. At that time defendant was discharged to the care of another physician. He said that his records showed that defendant had suffered from a convulsive disorder since he was one year old. Defendant would have akinetic seizures during which he would remain perfectly still with his eyes open and his body rigid. He would not speak and was unaware of his surroundings. Fitch's records showed that defendant's last seizure had occurred November 20, 1957. Fitch prescribed phenobarbital and dilantin throughout his entire treatment of defendant. Defendant's deposition showed that he knew that these drugs were to be taken after every meal every day. Because of defendant's condition Fitch made a report to help defendant obtain a driver's license. Fitch said that he made a report to the Division of Motor Vehicles that if defendant took his drugs he was able to operate a motor vehicle. Defendant in fact obtained a license in 1969. He had not been able to obtain a license before then when he became 17 years old.
Defendant testified. He said that at the time of the accident he was driving along Surf Avenue in Beachwood with his wife and infant daughter. He decided to pass a slow-moving vehicle ahead of him. He accelerated and "pulled out to pass it and that's when the car started swerving, everything." The accelerator stuck. Defendant said he applied the brakes at least a half a dozen times, if not more, and that he did succeed in reducing somewhat the speed of the car. He turned around and yelled to his wife to hold onto the baby. The impact occurred in the center of the road, at a point where "a hill" in front of *55 defendant obstructed his vision "completely." Defendant further testified on both direct and cross-examination that he took his pills on the day of the accident after breakfast. He also said that he had not eaten lunch and therefore had not taken a second dosage before the time of the accident. Defendant also introduced a recall notice from the Ford Motor Company for his vehicle.
Defendant objected on the basis of the physician-patient privilege to answering questions on cross-examination relating to what he told Dr. Saguil concerning when he took his medication. But the trial judge held that by testifying on his own behalf he waived the privilege. Defendant then stated that he had not told the doctor that he had not taken phenobarbital for three days before the accident because he had run out of the drug. He also indicated that he knew that it was important for him to take the pills to drive safely.
On redirect examination defendant stated that he purchased his drugs before the accident on May 4, 1976 and that they lasted 1 1/2 months. It is clear from this testimony that defendant wanted the jury to infer that he must have had an adequate supply on the day of the accident, May 23, 1976.
Defendant called Howard Pollock of the Division of Motor Vehicles concerning his licensing. Pollock testified that defendant did obtain a driver's license but that when he was originally licensed he was required to file medical reports concerning his condition. The Division of Motor Vehicles discontinued this obligation in 1971.
The State presented rebuttal testimony. Leonard Keller, who was self-employed in the garage business and who was also an accident investigator and instructor with the State Police on the subject of accidents caused by mechanical failures, testified that he was familiar with the Ford recall described by defendant. Keller examined defendant's vehicle the day following the accident and determined that the vehicle did not have the mechanical problem involved in the recall. He further testified that in *56 his opinion the accelerator of defendant's vehicle was pushed all the way to the floor at the time of impact. The State also presented the testimony of Dr. Saguil who had been the physician at the hospital on the day of the accident. Defendant's objection that his testimony would violate the physician-patient privilege was overruled. Saguil contradicted defendant's testimony and said that defendant told him that he had not taken dilantin or phenobarbital for three days before the accident because he had run out of the medicine. He also testified that defendant had told him that he did not recall what had happened immediately prior to or after the accident.
Defendant appeals, raising the following points:
(1) Trial court erred concerning patient-physician privilege.
(2) Error as to rebuttal testimony of Dr. Saguil.
(3) Admission of evidence of two (2) prior accidents was in error.
(4) Court erred in allowing the introduction of the results of blood tests into evidence.
(5) Court erred as to testimony of Dr. De.
(6) Court erred regarding depositions.
(7) Court should have granted defendant's motions for directed verdicts both after State's case and at end of all testimony.
(8) Prosecutor committed reversible error during summation.
(9) Sentence passed by court was manifestly excessive and should be reduced.
There was no error in permitting the cross-examination of defendant with respect to his statement to Dr. Saguil concerning when he took the medicine. Further, the trial judge did not err in allowing Dr. Saguil's testimony as to the content of the statement on rebuttal. The physician-patient privilege did not preclude receipt of the testimony. Before the State was allowed to cross-examine defendant concerning the statement he had already testified that he had taken his medicine on the day of the accident. Thus the statement he made to Dr. Saguil directly contradicted his testimony. Even assuming that the State did not have the right to introduce Dr. Saguil's testimony on its direct case, when defendant testified that the medicine had been taken he waived any privilege which he might have had to keep the statement he made to Dr. Saguil from the jury.
*57 There was no common law physician-patient privilege in New Jersey. Hague v. Williams, 37 N.J. 328 (1962). The privilege was not adopted as a portion of the rules of evidence adopted by the Supreme Court to be effective September 11, 1967. Rather, the privilege originated by statute, L. 1968, c. 185, and is codified as N.J.S.A. 2A:84A-22.1 et seq. The statute does not state that it exclusively enumerates the methods by which the privilege may be waived, though it does provide that the privilege may be terminated if the patient causes the physician to testify as to any matter which the physician gained through the communication. N.J.S.A. 2A:84A-22.7. When a patient testifies to a course of conduct directly opposed to that which he told a physician he followed, we see no reason why he should be entitled to rely on the physician's silence to hide the truth.
In dealing with the federal exclusionary rule of items illegally seized and with admission of a defendant's statements obtained in violation of his privilege against self-incrimination, the Supreme Court of the United States sharply distinguishes between use of the evidence on the prosecution's direct case and use for cross-examination of a defendant testifying. Although certainly not downgrading the policies which have led to these exclusionary rules, the court has limited their application in favor of a policy which recognizes the significance of the integrity of the judicial proceedings being upheld. Thus, illegally seized evidence may be used to impeach the credibility of a defendant testifying. United States v. Havens, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). Similarly, if a statement is taken from a defendant in violation of his Miranda rights, even though it is otherwise not admissible, if the defendant testifies it may be used on cross-examination for impeachment purposes. Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); State v. Miller, 67 N.J. 229 (1975).
The reasons given by the Supreme Court of the United States in allowing such otherwise excluded testimony if the defendant testifies are applicable here. We ought not to allow the privilege *58 to shield a defendant who attempts to convince the jury of what may be untrue. As the court said in Havens: "We have repeatedly insisted that when defendants testify, they must testify truthfully or suffer the consequences." 446 U.S. at 626, 100 S.Ct. at 1916, 64 L.Ed.2d 565-566. Such considerations do not apply when the State is presenting its case and defendant is simply putting it to its burden of proof. Here defendant testified in his own defense that he had taken his pills on the morning of the accident. Such testimony was simply irreconcilable with his statement to Dr. Saguil on the day of the accident. In the circumstances the jury should have heard that statement as the trial was, after all, as noted in Hass, a search for the truth. 420 U.S. at 722, 95 S.Ct. at 1220, 43 L.Ed.2d at 578. Further, it was properly admitted as substantive proof of what was asserted in the statement. See Evid. R. 63(1); State v. Ross, 80 N.J. 239, 248 (1979); State v. Provet, 133 N.J. Super. 432, 437 (App.Div.), certif. den. 68 N.J. 174 (1975).
In reaching this result we are mindful that admission of relevant evidence should be the rule and exclusion the exception, and that accordingly the physician-patient privilege should be restrictively construed. State in the Interest of M.P.C., 165 N.J. Super. 131, 136 (App.Div. 1979). We also recognize that the physician-patient privilege does not have the ancient origins of privileges such as the husband-wife privilege and the lawyer-client privilege. We point out that since defendant himself produced medical testimony by which he intended to convince the jury that he could properly drive when he took his medicine, the exclusion of Dr. Saguil's testimony would have permitted defendant to mock justice by picking and choosing between physician witnesses. See State v. Tradewell, 9 Wash. App. 821, 824, 515 P.2d 172, 174 (Ct.App. 1973), cert. den. 416 U.S. 985, 94 S.Ct. 2388, 40 L.Ed.2d 762 (1974). He would have demonstrated his theoretical capacity to operate the vehicle but concealed his failure to take the steps required to drive safely in fact. A decision excluding Dr. Saguil's testimony would have countenanced a fraud on the court.
*59 Finally, we note that in the circumstances of this case, even if the statement should not have been admitted, the error was harmless. See R. 2:10-2; State v. Macon, 57 N.J. 325, 336 (1971). There was no other explanation for defendant's conduct than his failure to ingest the drugs. Defendant himself produced the testimony of Dr. Fitch which emphasized the importance of defendant taking the drugs. The circumstances of the accident showed wildly erratic driving consistent with defendant not having followed his regimen. It was shown that he had had two similar experiences within weeks of the accident. And while defendant attempted to attribute the incident to mechanical failure, there was no real proof of this and indeed the State thoroughly rebutted his contention.
Defendant's argument that evidence of the two prior accidents should not have been admitted lacks merit. Defendant agrees that under Evid. R. 55 evidence of the commission of a crime or civil wrong by a person may be admitted for certain purposes but argues that here it was not established that defendant's conduct was either a crime or civil wrong. But it does not matter whether defendant's conduct may be so characterized. Evid. R. 55 generally precludes the admission of evidence that a person committed a crime or civil wrong on a specified occasion to show a disposition to engage in such conduct at another time. Such evidence is admissible to prove some other fact in issue, including knowledge or an absence of mistake or accident. But conduct of a party which is not criminal or tortious is similarly admissible to prove some other fact in issue. See State v. Zarinsky, 143 N.J. Super. 35, 56 (App.Div. 1976), aff'd 75 N.J. 101 (1977). The exclusion of other crime or tort evidence is justified even though such evidence may be logically relevant on a theory that such evidence may weigh too heavily with a jury and thus be unfair to defendant. State v. Miller, 159 N.J. Super. 552, 562 (App.Div. 1978). Thus Evid. R. 55 is primarily a rule of exclusion. The evidence it allows would be admissible in the absence of the rule. Evid. R. 7(f). Therefore, regardless of whether defendant's conduct was *60 criminal or tortious at the time of the prior accidents, evidence of what defendant did on those occasions was admissible if relevant to show some fact in issue. Here the evidence was relevant. The incidents certainly should have demonstrated to defendant the risk that he posed to himself and anyone else on the road by continuing to drive even though the State could not explicitly prove that he had not been taking his medicine at the time of those incidents. The evidence was thus admissible in a charge of willful or wanton death by automobile to prove knowledge of his incapacity to operate a vehicle.
There was no error in the rulings of the court permitting Dr. De to testify or in the admission of the laboratory report showing defendant's blood to be free of alcohol, barbiturates or drugs. Even assuming that the fact that Dr. De was to testify should have been made known earlier, the judge had discretion to admit his testimony. R. 3:13-3(f). The judge pointed out to defendant that he would have time to rebut it. We cannot say there was an abuse of discretion. Further, the laboratory report was properly admitted as a business record. State v. Martorelli, 136 N.J. Super. 449 (App.Div. 1975), certif. den. 69 N.J. 445 (1976); Evid. R. 63(13).
The portions of the deposition in the civil case offered were properly admitted. If defendant wanted to assert the privilege against self-incrimination it was his personal obligation to do so at the time of the civil deposition. State v. Jennings, 126 N.J. Super. 70, 75 (App.Div.), certif. den. 60 N.J. 512 (1972). Certainly the privilege against self-incrimination may be raised in a civil case. Mahne v. Mahne, 66 N.J. 53 (1974). But the State in no way coerced defendant to testify there. While defendant points out that his civil lawyer was not aware of the criminal proceedings, that is not significant. Defendant knew from the day of the accident that he was in criminal jeopardy. If he wanted his civil lawyer to know of the criminal proceedings, he should have told him.
*61 The judge had no obligation to require that all of the deposition be read. The State introduced the portions relating to defendant's condition. This did not open up the matter so defendant could use the portion relating to the happening of the accident. The deposition was admissible as a statement by defendant. We see no more reason for all of the deposition to be admitted than for all of a conversation to be admitted when only a portion is incriminatory. Even if the deposition were admitted pursuant to R. 4:16-1 as in a civil case, the State would not have had to offer all of it. Rather, the parts germane to what was offered would have been read to the jury.
We have considered the other contentions of defendant, including his challenge to the sentence. We find all to be clearly without merit. R. 2:11-3(e)(2). With respect to the sentence we note that defendant could have been treated in a far more severe fashion. His conduct resulted in the death of two people. Incarceration was entirely appropriate.
Affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).