658 A.2d 715

JESSICA STIGLIANO, AN INFANT, BY FRANK STIGLIANO, HER FATHER, AND MARIA STIGLIANO, HER MOTHER, HER PARENTS AND NATURAL GUARDIANS; AND FRANK STIGLIANO AND MARIA STIGLIANO, INDIVIDUALLY; AND AS THE PARENTS AND NATURAL GUARDIANS OF THE INFANT, JESSICA STIGLIANO, PLAINTIFFS–APPELLANTS, v. CONNAUGHT LABORATORIES, INC., A FOREIGN CORPORATION AND NIHAL S. NAGAHAWATTE, M.D., A PHYSICIAN AND SURGEON LICENSED TO PRACTICE MEDICINE AND SURGERY IN THE STATE OF NEW JERSEY; JOINTLY, SEVERALLY, INDIVIDUALLY AND IN THE ALTERNATIVE, DEFENDANTS–APPELLANTS.

Argued January 4, 1995—Decided May 31, 1995.

*E. Drew Britcher* argued the cause for appellants (*Stern, Steiger, Croland, Tanenbaum & Schielke,* attorneys; *Mr. Britcher* and *Armand Leone, Jr.,* on the brief).

*Stephen O. Mortenson* argued the cause for respondent Nihal S. Nagahawatte, M.D. (*Mortenson and Pomeroy,* attorneys).

*Keith G. Von Glahn* argued the cause for respondent Connaught Laboratories, Inc. (*Wilson, Elser, Moskowitz, Edelman & Dicker,* attorneys; *Sally H. Atkins,* on the brief).

*David S. Stone* submitted a brief on behalf of *amicus curiae,* Medical Society of New Jersey (*Stern & Greenberg,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

The issue in this medical-malpractice and product-liability action is whether defendants may introduce videotape depositions of plaintiffs' treating physicians in which they describe the cause of the infant plaintiff's chronic-seizure syndrome. The Law Division granted plaintiffs' motion to bar the testimony. In a reported opinion, the Appellate Division reversed. 270 *N.J.Super.* 373, 637 *A.*2d 223 (1994). We granted plaintiffs' motion for leave to appeal, 137 *N.J.* 163, 644 *A.*2d 611 (1994), and now affirm.

–I–

On March 17, 1987, plaintiffs Frank and Mary Stigliano brought their three-month-old daughter, plaintiff Jessica Stigliano, to defendant Dr. Nihal Nagahawatte for immunization against diphtheria, pertussis, and tetanus (a DPT shot). Defendant Connaught Laboratories, Inc. (Connaught) had manufactured the vaccine. Approximately six-and-one-half hours after Dr. Nagahawatte gave Jessica the shot, she suffered a series of convulsive seizures. Plaintiffs claim that the shot caused encephalopathy or "dysfunction of the brain," *Taber's Medical Dictionary* 540 (15th ed.1985). More specifically, they claim that the shot caused "DPT encephalopathy," which caused seizures that Jessica continues to experi-

ence. At the center of this case, therefore, is the question whether the DPT shot caused the seizures.

Jessica's parents consulted three pediatric neurologists, Dr. Jeffrey Buchhalter, Dr. A.M. Chutorian, and Dr. Joseph Schneider ("the treating doctors"), for diagnosis and treatment of Jessica's seizures. None of the treating doctors found any evidence that the DPT shot had caused the seizures, and they dispute the existence of DPT encephalopathy. They believe that Jessica would have experienced the seizures without the DPT shot. Specifically, Dr. Buchhalter reported that the "etiology [origin] is unclear." Dr. Chutorian reported that Jessica's medical "history and findings are not compatible with a pertussis [coughing] encephalopathy, the first DPT immunization undoubtedly causing a fever, which precipitated the seizure, as was the case with her other attacks." Dr. Schneider similarly concluded that Jessica's condition "is not consistent with a pertussis encephalopathy and the vaccine acted only as a trigger but has no other etiologic significance in causing the seizure." The treating doctors generally diagnosed Jessica with chronic or primary seizure. Dr. Chutorian explained "that probably, very likely she had congenital and possibly genetic epilepsy."

Mr. and Mrs. Stigliano, individually and on behalf of Jessica, sued Dr. Nagahawatte and Connaught Laboratories, alleging that Dr. Nagahawatte deviated from standard medical practice by administering the DPT vaccine without adequately examining Jessica. Plaintiffs contend that an adequate examination would have revealed that Jessica had a fever resulting from a streptococcus infection and that Dr. Nagahawatte deviated from accepted medical care by administering DPT vaccine to Jessica while she had a fever. The basis of their claim against Connaught is that the DPT vaccine "was a dangerous and defective product...."

Both Dr. Buchhalter, who practices medicine at Oregon Health Sciences University in Portland, Oregon, and Dr. Chutorian, whose major affiliation is at New York Hospital, reside out-of-state. Dr. Schneider practices medicine in New Jersey and will

be available to testify at trial. Because of the anticipated unavailability at trial of Drs. Buchhalter and Chutorian, defendants preserved their testimony in a videotape deposition, pursuant to *Rule* 4:14–9.

At his deposition, Dr. Chutorian noted that Jessica has "a low seizure threshold, which is another way of saying that she had epilepsy, because her seizures were both right and left focal motor, which is very unusual in pure febrile seizures." He concluded that the only association between the DPT shot and Jessica's seizures was that the shot caused the fever, which in turn precipitated the seizures.

Dr. Buchhalter testified that Jessica suffers from "an underlying seizure propensity which just happened to be elicited this first time by the fever associated with DPT and would have occurred and, in fact, did occur subsequently in the context of fevers associated with ear infections, upper respiratory tract infection, in her case a urinary tract infection." He further concluded that the DPT shot had not caused Jessica's disorder because

her seizure disorder extended beyond the simple febrile seizures that I think a consensus of pediatric neurologists would accept as part of the rise in temperature following the immunization and as there is no convincing evidence in the medical literature that her kind of seizure disorder can follow DPT immunization, I didn't see any reason to consider it.

In preparation for trial, plaintiffs have retained two experts who assert that the DPT shot has caused Jessica's seizures. Defendants have retained three experts who conclude that Dr. Nagahawatte followed accepted medical practices and that the DPT vaccine did not cause the seizures.

On plaintiffs' motion, the Law Division entered an order precluding defendants from referring at trial to the treating physicians' opinions on the cause of Jessica's seizure disorder. The order also directed defendants to eliminate all causation testimony from the depositions of Drs. Chutorian and Buchhalter. According to the trial court, the treating doctors are not experts and should not be "allowed to render opinions that would be harmful to a patient's case...." Further, the court concluded that the

plaintiffs would be "unduly prejudiced" if the jury heard the testimony about causation "from the plaintiff's own treating physicians...."

The Appellate Division granted defendants' motion for leave to appeal and reversed. It stated that "[t]here is no 'general rule' that a treating physician 'is not allowed to render opinions that would be harmful to a patient's case.'" 270 *N.J.Super.* at 377, 637 *A.*2d 223 (quoting *Stempler v. Speidell,* 100 *N.J.* 368, 381, 495 *A.*2d 857 (1985)). Although the court recognized that a patient has a "legitimate interest in assuring" that the treating doctor will not voluntarily aid the other side, *ibid.,* it concluded that a treating doctor may testify about the examination of a patient and the resulting diagnosis, *id.* at 378, 637 *A.*2d 223. Reasoning that the treating doctors' opinions about causation were related to Jessica's treatment, the court saw "no reason to distinguish the doctors' testimony as to causation and their testimony as to diagnoses and prognoses." *Id.* at 379, 637 *A.*2d 223. Finally, "[i]f the testimony of the treating doctors is harmful to plaintiffs, it is not unfairly so." *Ibid.*

–II–

██  The physician-patient privilege, like all privileges, stands as an exception to the general rule that trials are a search for truth. *Graham v. Gielchinsky,* 126 *N.J.* 361, 373, 599 *A.*2d 149 (1991). As we have previously explained, the "inevitable effect of allowing the privilege ... is the withholding of evidence, often of the most reliable and probative kind, from the trier of fact." *State v. Dyal,* 97 *N.J.* 229, 237, 478 *A.*2d 390 (1984); *see Graham, supra,* 126 *N.J.* at 373, 599 *A.*2d 149; *Kurdek v. Board of Educ.,* 222 *N.J.Super.* 218, 226, 536 *A.*2d 332 (Law Div.1987); McCormick, *Handbook of the Law of Evidence* § 105 at 390 (4th ed. 1992) (McCormick) (stating that privilege "essentially runs against the grain of justice, truth and fair dealing").

The traditional justification for the physician-patient privilege is that it encourages patients to disclose freely information needed

for the diagnosis and treatment of disease and injury. *State v. Schreiber,* 122 *N.J.* 579, 587, 585 *A.*2d 945 (1991); McCormick, *supra,* § 103 at 384. Because privileges undermine the search for truth, however, courts construe them strictly. *Schreiber, supra,* 122 *N.J.* at 583, 585 *A.*2d 945; *State v. Soney,* 177 *N.J.Super.* 47, 58, 424 *A.*2d 1182 (App.Div.1980), *certif. denied,* 87 *N.J.* 313, 434 *A.*2d 67 (1981); *State, in the Interest of M.P.C.,* 165 *N.J. Super.* 131, 136, 397 *A.*2d 1092 (App.Div.1979). So here, we strictly construe the physician-patient privilege.

Until the adoption on July 1, 1993, of the New Jersey Rules of Evidence, the sole legal basis for the physician-patient privilege was *N.J.S.A.* 2A:84A–22.1. *N.J.R.E.* 506, however, now incorporates the statute as part of the *Rules of Evidence.* Biunno, *Current N.J. Rules of Evidence* comment 1 on *N.J.R.E.* 506 (1994).

*N.J.R.E.* 506 and *N.J.S.A.* 2A:84A–22.4 provide in relevant part: "There is no privilege under this act in an action in which the condition of the patient is an element or factor of the claim or defense of the patient or of any party claiming through or under the patient...." *See also Stempler, supra,* 100 *N.J.* at 373, 495 *A.*2d 857 (stating that "instituting suit extinguishes the privilege to the extent that [plaintiff's] medical condition will be a factor in the litigation"); McCormick, *supra,* § 103 at 384 (explaining that "[f]ailure to find a waiver from assertion of a claim or defense predicated upon a physical or mental condition has the awkward consequence of effectively frustrating discovery on a central issue of the case ...").

When construing the statute, courts have honored the physician-patient privilege when it serves a more important policy consideration than the need for full disclosure. *State, in the Interest of M.P.C., supra,* 165 *N.J.Super.* at 136, 397 *A.*2d 1092. For example, notwithstanding the privilege, otherwise confidential information may be introduced on rebuttal. *Soney, supra,* 177 *N.J.Super.* at 56, 424 *A.*2d 1182. In *Soney,* a death-by-automobile case, the Appellate Division allowed cross-examination of the defendant

concerning the defendant's statement to his physician. The defendant had told his doctor that he had not taken his medication for three days, but he testified at trial that he had taken the medication on the day of the accident. In permitting the physician to testify about the defendant's statement, the court reasoned: "When a patient testifies to a course of conduct directly opposed to that which he told a physician he followed, we see no reason why he should be entitled to rely on the physician's silence to hide the truth." *Id.* at 57, 424 *A.2d* 1182.

■ By bringing suit against Dr. Nagahawatte and Connaught, plaintiffs have waived the physician-patient privilege. Jessica's seizure disorder is the subject of the litigation. Plaintiffs do not challenge the waiver of the privilege concerning treatment and diagnosis of Jessica's seizure disorder. They concede that the treating doctors may testify as fact witnesses about their examination and diagnoses of Jessica's condition.

Because plaintiffs do not intend to call the treating doctors to testify about the cause of Jessica's disorder, they claim, however, defendants may not elicit causation testimony from those doctors. We disagree. Once a patient waives the physician-patient privilege, it "is a waiver of the privilege in regard to *all* of his knowledge of the physical condition asked about." 8 *Wigmore on Evidence* § 2390 at 861 (McNaughton rev.1961). The determination of causation is an essential part of diagnosis and treatment. Doctors must determine the cause of a disease to treat the patient. As loving and concerned parents, Mr. and Mrs. Stigliano consulted the treating doctors to find out what was wrong with Jessica and what caused her problems. To bar the treating doctors' testimony about the cause of Jessica's disorder would deprive the jury of relevant information on the crucial issue in the case.

■ Plaintiffs also contend that defendants must qualify the treating doctors as experts before the doctors may testify about causation. They rely on our opinion in *Graham,* which held that absent exceptional circumstances, courts should not admit the opinion testimony of an expert that an adversary consulted but did

not intend to call at trial. 126 *N.J.* at 373, 599 *A.*2d 149. *Graham,* however, is distinguishable. In *Graham,* we were concerned that trial attorneys might consult fewer experts because of the fear that "countless claims of malpractice would be leveled against attorneys who put unfavorable expert evidence in as part of their clients' case-in-chief." *Ibid.* Here, plaintiffs consulted the treating doctors not for the purpose of obtaining expert testimony to support their cause of action, but for treatment. Allowing defendants to introduce the treating doctors' testimony concerning causation will not affect either Jessica's medical treatment or counsel's search for experts. In fact, plaintiffs have retained two experts who support plaintiffs' contentions.

Plaintiffs also rely on *Spedick v. Murphy,* 266 *N.J.Super.* 573, 630 *A.*2d 355 (App.Div.), *certif. denied,* 134 *N.J.* 567, 636 *A.*2d 524 (1993), in which the Appellate Division ruled that the defendant could call treating doctors to testify about the plaintiff's complaints and medical history, as well as the doctors' physical examinations and diagnoses. *Id.* at 591, 630 *A.*2d 355. The Appellate Division recalled our statement in *Graham, supra,* 126 *N.J.* at 373, 599 *A.*2d 149, that, "in the absence of 'exceptional circumstances,' courts should not allow the opinion testimony of an expert originally consulted by an adversary." *Spedick, supra,* 266 *N.J.Super.* at 592, 630 *A.*2d 355.

In *Spedick,* however, the court concluded that

we are dealing with two physicians [ ] who plaintiff first consulted for treatment shortly after the accident. Plaintiff never intended to call these doctors as witnesses. Defendant, therefore, was properly permitted to call these witnesses, not to obtain opinions about plaintiff's disabilities, but to testify concerning their physical examinations and diagnoses of plaintiff shortly after the injury. This testimony was clearly relevant and material. To bar such testimony of the initial treating physicians would only serve to hinder the search for truth.

[*Id.* at 592, 630 *A.*2d 355.]

In sum, plaintiffs misplace their reliance on *Graham* and *Spedick.* The treating doctors did not examine Jessica in anticipation of litigation or in preparation for trial, but for the purpose of treatment. Unlike an expert retained to testify at trial, the

treating doctors gained no confidential information about plaintiffs' trial strategy. Although the treating doctors are doubtless "experts," in this case they are more accurately fact witnesses. Their testimony relates to their diagnosis and treatment of the infant plaintiff. In this context, moreover, the characterization of the treating doctors' testimony as "fact" or "opinion" creates an artificial distinction. A determination of causation partakes of both fact and opinion. The critical point is that the treating doctors to treat their patients must determine the cause of a disease, whether that determination is characterized as fact or opinion.

■ As fact witnesses, the treating doctors may testify about their diagnosis and treatment of Jessica's disorder, including their determination of that disorder's cause. Their testimony about the likely and unlikely causes of Jessica's seizure disorder is factual information, albeit in the form of opinion. See *N.J.R.E.* 701 (permitting fact witness to testify in the form of opinion to assist in determining fact in issue). Because the determination of the cause of a patient's illness is an essential part of diagnosis and treatment, a treating physician may testify about the cause of a patient's disease or injury. That holding should not deter patients from freely disclosing information necessary for proper treatment and diagnosis. Only after patients put their injury or disease in issue may a treating doctor testify about the diagnosis and treatment of that injury or disease.

We are unpersuaded by plaintiffs' reliance on *Piller v. Kovarsky,* 194 *N.J.Super.* 392, 476 *A.*2d 1279 (Law Div.1984), and *Serrano v. Levitsky,* 215 *N.J.Super.* 454, 521 *A.*2d 1377 (Law Div.1986). In *Piller,* the Law Division held that the physician-patient relationship precluded a treating physician from testifying that defendant-doctors had not deviated from accepted medical standards. *Id.* at 399, 476 *A.*2d 1279. In *Serrano,* the Law Division found it "unfair" to admit an unsolicited statement in the treating physician's report to plaintiff's counsel. The treating

physician had insisted on stating gratuitously that the defendant-doctor was not negligent in his treatment of the plaintiff.

*Piller* and *Serrano* differ significantly on the facts. In those cases, the defendant-doctors sought to ask the treating physicians not about their treatment of the plaintiffs, but about the defendant's alleged malpractice. Here, in contrast, defendants seek to call the treating doctors to testify about those doctors' treatment of the infant plaintiff, including their determination of the cause of her condition. Unlike in *Serrano*, moreover, the treating doctors' statements about causation were neither unsolicited nor gratuitous. One of the reasons Mr. and Mrs. Stigliano consulted the treating doctors was to ascertain the cause of Jessica's problem. As distinguished from the doctors in *Piller* and *Serrano*, the treating doctors needed to determine the cause of Jessica's problems so they could treat her. Accordingly, *Piller* and *Serrano* do not prevent the treating doctors from offering their opinions on the cause of Jessica's disorder.

Courts in other states also have allowed treating physicians to render opinions on causation and other issues relating to the patient's medical condition. The Supreme Court of Washington recently held that a plaintiff's treating physician could testify about the cause of plaintiff's glaucoma because a "treating physician may testify as to both fact and opinion in a medical malpractice action regardless of whether the physician is a defense or plaintiff's witness." *Christensen v. Munsen*, 123 *Wash.*2d 234, 867 *P.*2d 626, 629 (1994); *see also Carson v. Fine*, 123 *Wash.*2d 206, 867 *P.*2d 610, 616–17 (1994) (concluding that "[t]here is no basis in reason, the common law or in statutory law to draw a distinction between the types of testimony a treating physician may offer once the physician-patient privilege has been waived ...").

In *Richbow v. District of Columbia*, 600 *A.*2d 1063 (D.C.1991), the District of Columbia Court of Appeals declined to adopt a waiver divisible between fact and opinion testimony in holding that the waiver of the physician-patient privilege permitted treating doctors to testify about both fact and opinion. The court conclud-

ed that "[h]aving waived the privilege as to factual information, a plaintiff may not keep from the factfinder the medical judgments and opinions which were derived from the treatment and which indeed shaped it." *Id.* at 1069. Consequently, the court allowed the plaintiff's treating physician to provide his opinion on the cause of the plaintiff's cancer and on the question whether early detection could have allowed another form of treatment.

Likewise, in *Cates v. Wilson*, 321 *N.C.* 1, 361 *S.E.*2d 734 (1987), the Supreme Court of North Carolina found no distinction between a treating physician's information of a patient's condition and the physician's opinion of the patient's health. The court concluded that a patient who discloses confidential information loses the right to claim that the disclosed information is covered by the physician-patient privilege. *Id.*, 361 *S.E.*2d at 743. In reaching that conclusion, the court held that the patient's waiver of the privilege "extended to any opinion held by these treating physicians formed as a result of information gained in their treatment of the plaintiffs." *Ibid.*

The relationship between treating physicians and their patients, sometimes described as fiduciary in nature, gives rise to a duty to testify in judicial proceedings about treatment rendered to the patient. By defining the physician-patient privilege, *N.J.R.E.* 506 and *N.J.S.A.* 2A:84A–22.1 outline the scope of a physician's testimonial duty. That definition, which provides that patients waive the privilege by placing their condition in issue, adequately balances the interests of the physician, patient, and public. We are disinclined to frustrate the definition through a more restrictive interpretation of the fiduciary relationship between physician and patient.

Although the *Principles of Medical Ethics* of the American Medical Association do not speak in terms of "privilege" or "waiver," they point in the same direction as the physician-patient privilege. In section 9.07 of the *Principles of Medical Ethics,* the American Medical Association recognizes the ethical obligation of physicians to assist in the administration of justice. *Current*

*Opinions of the Council on Ethical and Judicial Affairs of the American Medical Ass'n,* § 9.07 at 37 (1986). Section 9.07 states that communications between physician and patient are confidential and that a physician has a duty to "testify honestly and truthfully." *Ibid.* As the Washington Supreme Court recently stated: "Once a patient decides to file a medical malpractice action and disclose that which had been confidential, she cannot insist on continued confidentiality from her physicians regarding the condition at issue based on the fiduciary nature of their relationship." *Carson, supra,* 867 *P.*2d. at 618. By placing Jessica's medical condition in issue, plaintiffs not only have waived the physician-patient privilege but also have relieved the treating doctors of their fiduciary duty not to disclose information concerning her condition.

Finally, we conclude that the probative value of the treating doctors' testimony outweighs its prejudicial effect under *N.J.R.E.* 403. In reaching that conclusion, we are aware of the potential effect on the jury of the treating doctors' testimony that the DPT vaccine has not caused the infant plaintiffs' condition. The question, however, is not merely whether the treating doctors' testimony will be prejudicial to the plaintiffs, but whether it will be unfairly so. Clearly, the treating doctors' testimony is relevant. A jury, moreover, could find the testimony both reliable and persuasive. Nothing indicates that the doctors' testimony will confuse or mislead the jury. In our adversary system, parties generally offer evidence to help their cause and prejudice that of an adverse party. *Kurdek, supra,* 222 *N.J.Super* at 223, 536 *A.*2d 332. We would ill-serve the cause of truth and justice if we were to exclude relevant and credible evidence only because it might help one side and adversely affect the other.

Without impugning the expert witnesses who may testify for either plaintiffs or defendants, the treating doctors may be the only medical witnesses who have not been retained in anticipation of trial. A jury could find the treating doctors' testimony to be more impartial and credible than that of the retained experts.

Excluding the treating doctors' testimony would undermine the ultimate objective of a trial, the determination of the truth. On balance, we find that the probative value of the treating doctors' testimony outweighs any prejudice to plaintiffs.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN–7.

*Opposed*—None.