# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0407-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RICHARD S. RANDAZZO,

     Defendant-Appellant.

_____

Submitted February 11, 2019 – Decided March 14, 2019

Before Judges Fasciale, Gooden Brown and Rose.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 13-03-1026.

Joseph E. Krakora, Public Defender, attorney for appellant (Margaret R. McLane, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Arielle E. Katz, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

A grand jury indicted and charged defendant with committing first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (Count One); two counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (Counts Two and Four); and third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7) (Count Three).  On Count One, the jury found him guilty of second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1).  They found him guilty on Counts Two and Four (for offenses committed on different dates), and acquitted him on Count Three.  We affirm.

The victim in this case was defendant's two-month-old daughter.  She sustained fractures to her left upper arm, legs, and fifth rib, stopped breathing, and went into cardiac arrest.  An ambulance took her to the hospital and four days later, the doctors removed her from life support and she died.  During those four days, she had suffered from internal bleeding; swelling and a subdural hemorrhage of the brain; fluid in her lungs; seizures; and massive retinal hemorrhages.

The police asked defendant and his wife, who was not home when the injuries occurred, to give statements.  They arrived at the police station for that purpose, and while defendant was giving his statement, the police received information from a doctor that the victim's injuries were consistent with abuse.

2

After the police conveyed that information to defendant, he then admitted that what he had said up to that point was a lie. He explained that he had killed his daughter, but that it was an accident.

On appeal, defendant argues:

POINT I

BECAUSE THE POLICE OBTAINED A CONFESSION ONLY AFTER LYING TO DEFENDANT BY SPECIFICALLY TELLING HIM HE WAS REQUIRED TO EXPLAIN THAT HIS DAUGHTER'S DEATH WAS ACCIDENTAL, THE STATEMENT MUST BE SUPPRESSED.

POINT II

THE MOTION FOR A JUDGMENT OF ACQUITTAL ON ENDANGERING SHOULD HAVE BEEN GRANTED BECAUSE THE STATE FAILED TO PRESENT ANY EVIDENCE THAT DEFENDANT CAUSED THE RELEVANT INJURY.

POINT III

THE EVIDENCE OF HEALING FRACTURES WAS EITHER INTRINSIC OR ENTIRELY IRRELEVANT AND HIGHLY PREJUDICIAL. THE COURT ERRED IN FAILING TO PROVIDE A LIMITING INSTRUCTION. (Not Raised Below).

POINT IV

THE COURT ERRED IN ALLOWING A DOCTOR TO TESTIFY AS AN EXPERT WITHOUT BEING PROPERLY QUALIFIED, AND FURTHER ERRED

A-0407-16T4

IN ALLOWING THE SAME DOCTOR TO TESTIFY TO THE ULTIMATE ISSUE. (Not Raised Below).

POINT V

THE COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES, AND THE SENTENCE IS OTHERWISE MANIFESTLY EXCESSIVE.

I.

We begin by addressing defendant's challenge to his confession. He argues that the detectives lied to him about the victim's injuries, they told him that the assistant prosecutors would never believe his claim that he did not know what had happened, and that the detectives improperly suggested that they would "go to bat" for him if he provided a statement. Defendant contends therefore that his confession was involuntary, the judge erred by admitting it, and we should vacate the convictions.

Defendant initially told the detectives that he had the victim propped up on a pillow and went into the kitchen for one or two minutes. When he returned to the room, defendant said that she was in the same position, but she had started gagging on a Cheerio and did not look right. He said he picked her up and started to hit her back for about thirty seconds to a minute, but then she became completely limp. Defendant told the detectives he tried to revive her by

A-0407-16T4

breathing into her mouth and doing chest compressions, and that he called 9-1-1.

During the interview, the detectives left the room and spoke on the telephone with a doctor. They then returned and informed defendant that the doctor advised them that the situation was "much more worse" than they previously thought because the victim had "many more broken bones." The detectives told defendant that the victim had broken bones "[a]ll over" and that they could have occurred within the last week. The detectives told defendant that someone had "brutally beat, and kicked and [threw]" her, or she was "either kicked, thrown, [or] dropped down a flight of steps." Defendant told the detectives that he "never threw [his] child," "hurt [his] child," or "threw her down a flight of stairs." They probed further:

> DETECTIVE: You know what I think? I think there was an accident . . . and you're afraid to say it.
>
> DETECTIVE 2: That something happened, you just didn't [want to] tell your wife. That's all right.
>
> DETECTIVE: If it was an accident—
>
> DETECTIVE 2: I would [want to] fight for someone['s] rights that's not here right now to fight for.
>
> DETECTIVE: [Y]ou need to speak up—

DETECTIVE 2:  I want you to tell me what the hell is going on here before we have to continue to go through this.

. . . .

DETECTIVE:  [P]lease listen to me.  Please listen.  If you don't be a voice for [the victim] and tell us what happened, whether you did something, or something else happened, if it was an accident, you know, all that stuff is taken into consideration.  But I'm telling you, when we take this down to the bosses, [they're going to] hang somebody's head.  All right?  If they hang you with a homicide . . . then all bets are off, and you're just [going to] have to fight it out.

If there was an accident, that's what you need to tell us because if that's what happened, that is a much, much, much easier thing to explain to the bosses than you have no idea what happened to your daughter.  The bosses don't want to hear that.  The prosecutors will not accept an ["]I don't know["] answer.  The only thing they will accept is a logical, heartfelt explanation for a father who loves his daughter and something tragically, accidentally happened.  Other than that, dude, you are f[*****], and you can't let it be like that.  You have to be her voice now.

In response, defendant informed the detectives that he accidently hurt the victim, and acknowledged that he knew he could request a lawyer.  The detectives at that point told defendant they would "go to bat for him" and try to work with him:

DEFENDANT: I'm telling you I did not do anything intentionally . . . to my daughter and I never did—and I'd never intentionally hurt her. It kills me inside.

. . . .

DEFENDANT: And I never intentionally did anything to hurt her, but I was so scared . . . because I didn't know what was [going to] happen. I didn't want my—you're right. I did not want my wife to know, and find out, but it was an accident.

DETECTIVE: Tell us what happened.

. . . .

DEFENDANT: I mean, I don't know—I'm just telling you—you're right. I mean, . . . I could get a lawyer right now, and I know that, but I don't—I don't want one. I mean at this point now I don't want one. . . .

. . . .

DETECTIVE: You just need to tell us what happened.

DEFENDANT: I'm telling you . . . I didn't intentionally do this and . . . I killed my child, but I didn't intend it, and that, you know, it wasn't by a purposeful action. It was an accident.

. . . .

DEFENDANT: [L]ike I said, . . . I mean, if I wanted to, I could have gotten a lawyer and I could have said ["]I plead the Fifth["] right now, and ["]I'm not saying another word,["] . . . I had to get it out . . . for my daughter.

7

. . . .

DEFENDANT:  And like I said, . . . I know I'm being recorded, and people are seeing this or whatever.

. . . .

DETECTIVE:  We will work with you.  All right? We're not heartless.

DEFENDANT:  I did not do this on purpose.

DETECTIVE:  [J]ust tell us what happened.  We can't help you unless we know the truth and we'll know what happened.

. . . .

DETECTIVE:  We'll go to bat for you.

Defendant then told the detectives his wife was "never [going] to forgive [him] because she's [going] to wonder why [he] lied, why [he] didn't . . . just say the truth in the beginning."  Defendant said:

> [T]here was a time, when I was, you know, coming down the stairs and I dropped her, and I dropped her and she—I tried to, you know, stop it, but I couldn't help it and she—we have a hard floor, and a high set of stairs, and I dropped her, but she seemed okay.  I mean, I would have taken her to a doctor right away.  She seemed okay.  I mean, she was crying and really fussy, and . . . she seemed okay.  And . . . I was scared to death.  And I mean, I'm just telling—I mean, honest to God, I never would intentionally hurt my child, and that—you know, the day that [the victim went into cardiac arrest], I had her on my knee and I was bouncing her on my

knee, like, you know, playing with her, and she went—
and that's when I was playing with her, and she just
went . . . and that's when I tried to save her . . . . I don't
know what happened, but I guess . . . I shook her too
hard, when I did that, and . . . she went into cardiac
arrest, apparently, now that I know.

The detective asked defendant if he became "frustrated with [the victim's] crying" and shook her. Defendant reiterated that he "had previously fallen [and] dropped her down the stairs when [he] was coming down" approximately one week and one-half prior to the victim's death. Defendant elaborated that the victim "landed right on that hard floor down at the bottom [of the stairs], and [he] kind of tripped a little bit when [he] dropped her and landed a little on top of her." He stated that his shoulder fell on top of her leg, but that he caught himself and did not hit her hard.

Defendant again acknowledged he knew he could request a lawyer by stating, "I could have said I want a lawyer and I don't [want to] talk to you . . . I'm just telling you. I'm telling you as a father, you know, because [the victim did not] deserve this . . . obviously, I'm still [going to] need one now." After recounting these events, the detective told him, "We'll go to bat for you. I can't promise [you] anything, but we'll definitely go to bat for you." Defendant asked how he could get a lawyer, and the detectives stopped questioning him.

The judge allowed defendant's statement into evidence on the State's pretrial motion. "[O]n appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). After a testimonial hearing, "appellate courts defer to the trial court's factual findings because the trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Elders, 192 N.J. 224, 244 (2007)). This deference extends to a trial court's determinations based on the review of a video, like here, because of the trial court's "experience and expertise in fulfilling the role of factfinder." Id. at 380. We "should not disturb a trial court's factual findings unless those findings are 'so clearly mistaken that the interests of justice demand intervention and correction.'" Id. at 374 (quoting Gamble, 218 N.J. at 425). The trial court's interpretation of the law and "the consequences that flow from established facts are not entitled to any special deference." Gamble, 218 N.J. at 425.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and [New Jersey]'s common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, [Rule] 503."

10

S.S., 229 N.J. at 381 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). The State must establish beyond a reasonable doubt that the statement was voluntary and, if the defendant was in custody, that he was advised of his Miranda[1] rights and "knowingly, voluntarily and intelligently waived" those rights. State v. W.B., 205 N.J. 588, 602 n.3 (2011); Nyhammer, 197 N.J. at 388. "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." State v. Hubbard, 222 N.J. 249, 267 (2015) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)).

On the State's motion, defendant did not argue that the detectives failed to give him his Miranda rights. Indeed, the judge found that defendant understood those rights and acknowledged he could request an attorney or stop talking if he chose to do so, which is exactly what he did at the end of his statement. Instead, he argued that he had been tired when he gave the statement, and that he did so within several hours of the victim's death. Nevertheless, the judge found that defendant never indicated he was unable to give the statement. After watching the confession video, the judge observed defendant was not falling asleep or

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

having trouble concentrating. To the contrary, the judge found that defendant was "very talkative" and fully engaged.

Defendant now contends that his statement was coerced and therefore involuntary. A statement is considered voluntary if it is "the product of an essentially free and unconstrained choice by its maker." State v. P.Z., 152 N.J. 86, 113 (1997) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)). If the defendant's "will has been overborne and his capacity for self-determination critically impaired," the use of the statement "offends due process." Ibid. (quoting Schneckloth, 412 U.S. at 225-26).

When determining whether a statement is voluntary, the judge examines "the totality of the circumstances to assess whether the waiver of rights was the product of a free will or police coercion." Nyhammer, 197 N.J. at 402. Factors to consider in this approach include the defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." State v. Presha, 163 N.J. 304, 313 (2000). The judge should also consider the elapsed time between the police's administration of the Miranda rights and the defendant's statement. State v. Timmendequas, 161 N.J. 515, 614 (1999).

12

Although courts should consider misrepresentations made by police officers when analyzing the totality of the circumstances, "misrepresentations alone are usually insufficient to justify a determination of involuntariness or lack of knowledge." State v. Cooper, 151 N.J. 326, 355 (1997). Additionally, "a misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession." Ibid. Officers "may employ deception or trickery in an interrogation of a suspect unless such deception or trickery was calculated to produce an untruthful confession or was offensive to due process." State v. Baylor, 423 N.J. Super. 578, 588-89 (App. Div. 2011). "[U]se of a psychologically-oriented technique during questioning is not inherently coercive," and "[t]he real issue is whether the person's decision to confess results from a change of mind rather than from an overbearing of the suspect's will." State v. Galloway, 133 N.J. 631, 654-55 (1993).

A police officer's "promise that statements made will not be used against the defendant purports to remove the specter of proving one's own guilt by making a statement. Such a promise is a . . . powerful one, going to the heart of a declarant's reservations about giving a statement." State v. Pillar, 359 N.J. Super. 249, 273 (App. Div. 2003); accord State v. Fletcher, 380 N.J. Super. 80,

92 (App. Div. 2005). If a defendant could "reasonably believe that the promise of an 'off-the-record conversation' 'meant that the statement would not be used against him,'" then "such a promise 'had the likelihood of stripping [the] defendant of his 'capacity for self-determination' and actually induced the incriminating statement." Fletcher, 380 N.J. Super. at 91-92 (quoting Pillar, 349 N.J. Super. at 272-73). "If [a] defendant believed that his statement could not be used against him, despite the earlier Miranda warnings, his statement made as a result of that false assurance could not be a free and voluntary one." Pillar, 359 N.J. Super. at 273. Moreover, whether an investigator's statement amounts to a promise must be viewed from the defendant's perspective. Id. at 272.

We have previously found a defendant's statement was voluntary even though the detectives had "engaged in some deception." Baylor, 423 N.J. Super. at 589. In Baylor, the defendant asserted that the detectives acted as if they were his friends and cared about his welfare. He maintained that they erroneously told him "that he faced the death penalty," and that they "reduced him to tears by applying 'unrelenting pressure' on him to confess and/or name the shooter." Id. at 588. He contended that they "attributed statements to him that were untrue" and that they "intended to 'trick' him into making inculpatory statements." Ibid. He said they had "lied about the evidence and witnesses

against him." Ibid. Even in light of these assertions, we affirmed the trial court's admission of the defendant's statement. Id. at 590.

Here, the record supports the judge's determination that defendant's statement was voluntary under the totality of the circumstances. Although the detectives may have employed some deceptive tactics in stating that they would "go to bat" for defendant, that alone does not render his statement involuntary. The detectives' statements here do not rise to the level of the facts in Fletcher and Pillar, where the defendants were promised that their statements to investigators would be "off-the-record." Fletcher, 380 N.J. Super. at 92; Pillar, 359 N.J. Super. at 273. Those situations are different because a detective representing that a defendant's statements would be "off-the-record" suggests that the defendant could make the statement with impunity. On the other hand, a detective's use of the phrase "go to bat" for a defendant does not carry the same connotation that a defendant would not face any consequences.

We reject defendant's arguments that the detectives lied about the extent and causes of the victim's injuries. The detective testified that he believed the victim had a skull fracture at the time of the interrogation because the doctor conveyed that information to him, even though he later learned that was incorrect. He also testified that after he spoke with the doctor about the injuries,

he "figured, due to those injuries" that it was "most likely" that the victim had been brutally beaten, kicked, dropped, or thrown, even if the doctor did not specifically tell him those were the causes. These statements are, therefore, not outright lies as defendant argues. Even if they could have been misleading, under the totality of the circumstances, the detective's remarks did not impair defendant's decision-making. Cf. Baylor, 423 N.J. Super. at 588-89 (stating officers "may employ deception or trickery in an interrogation" and affirming a defendant's statement as voluntary where defendant alleged officers presented themselves as friends and lied about evidence).

Moreover, the detectives' statements that defendant would need to tell them if the injuries were an accident did not render defendant's statement involuntary. As the judge found, defendant stated multiple times throughout his statement that he knew he could end the interrogation, remain silent, or request an attorney, which demonstrated that he knew he did not have to provide a statement to the detectives. Nonetheless, defendant continued to speak with the detectives.

Accordingly, the judge correctly found that defendant's waiver of his Miranda rights was knowing, intelligent, and voluntary—and not the product of coercion or official misconduct—in light of the totality of the circumstances,

16

and that his statement to police was voluntary, and, thus, admissible.

II.

Defendant argues that the judge erred by denying two motions for acquittal. He contends there was insufficient evidence regarding the victim's rib fracture to support his conviction for endangering the welfare of a child. He asserts that the State failed to present any evidence apart from defendant's police statement to prove he broke the victim's rib, and that the statement cannot be the sole evidence used to convict him of child endangerment.

We apply the same standard the judge used when deciding a motion for acquittal. State v. Moffa, 42 N.J. 258, 263 (1964). The standard is

> whether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.
>
> [State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011).]

That standard applies regardless of whether the motion was made during trial under Rule 3:18-1, or after the jury returned a verdict under Rule 3:18-2. Id. at 548-49. However, if the motion was made at the close of the State's case, we do not consider any evidence adduced in the defendant's case. State v. Reyes,

17

50 N.J. 454, 459 (1967); State v. Foreshaw, 245 N.J. Super. 166, 185 (App. Div. 1991). Rule 3:18-1 provides that after the State's case, "the court shall, on defendant's motion or its own initiative, order the entry of a judgment of acquittal of one or more offenses charged in the indictment . . . if the evidence is insufficient to warrant a conviction."

If the State relies on a defendant's confession, it must also "introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury." State v. Lucas, 30 N.J. 37, 56 (1959); accord State v. Reddish, 181 N.J. 553, 617 (2004). This requirement "avoid[s] the danger of convicting a defendant solely out of his own mouth of a crime that never occurred or a crime committed by someone else." State v. Johnson, 31 N.J. 489, 502-03 (1960). If the State is able to provide "'any legal evidence, apart from the confession of facts and circumstances, from which the jury might draw an inference that the confession is trustworthy,'" then the trial court should "refuse to grant a judgment of acquittal on these grounds." Reddish, 181 N.J. at 617 (quoting Lucas, 30 N.J. at 62).

Pursuant to N.J.S.A. 2C:24-4(a)(2), which addresses child endangerment:

> Any person having a legal duty for the care of a child
> or who has assumed responsibility for the care of a

18

child who causes the child harm that would make the child an abused or neglected child . . . is guilty of a crime of the second degree.

The State must "prove defendant acted 'knowingly' to convict him of endangering the welfare of a child[.]" State v. Overton, 357 N.J. Super. 387, 393 (App. Div. 2003). Indeed, the judge instructed the jury:

> To find . . . defendant guilty of [endangering the welfare of a child], the State must prove beyond a reasonable doubt these elements: 1) [t]hat [the victim] was a child; 2) [t]hat defendant knowingly caused the child harm that would make the child abused or neglected; 3) [t]hat defendant knew such conduct would cause the child harm that would make the child abused or neglected; 4) [t]hat defendant had a legal duty for the care of the child or had assumed responsibility for the care of the child.
>
> . . . .
>
> A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that the conduct is of that nature or that such circumstances exist or the person is aware of a high probability of their existence. A person acts knowingly with respect to a result of the conduct if [he] is aware that it is practically certain that such conduct will cause a result.
>
> . . . .
>
> It is within your power to find that such proof [of knowledge] has been furnished beyond a reasonable doubt by inferences which may arise from the nature of his acts and conduct and from all he said and did at the

19

particular time and place and from all surrounding circumstances established by the evidence.

After the State rested its case, defendant moved for a judgment of acquittal. In denying the motion, the judge found that there was a substantial amount of medical testimony, which when viewed in favor of the State, indicated that the victim suffered trauma inflicted while in defendant's care. The judge stated that, although the evidence was circumstantial, "the jury could certainly find, beyond a reasonable doubt, that these injuries were caused by . . . defendant."

At the sentencing hearing, defendant argued the merits of his second acquittal motion. The judge noted that according to defendant's statement to detectives, he dropped the victim down the stairs and accidently fell on top of her about a week or so before she stopped breathing, and yet he did not seek medical treatment for her or advise his wife of the occurrence. Additionally, there was medical evidence corroborating that the rib fracture occurred between one to six weeks before admission into the hospital. The judge, therefore, denied the motion for a judgment of acquittal and concluded that there was "little question that having been presented with these facts, the jury could have found . . . defendant endangered the welfare of" the victim, and that the jury did make such a finding.

A-0407-16T4

Although the State relied on defendant's statement, it also presented expert medical testimony to support the timing and manner that the rib fracture occurred. Even though the medical experts disagreed on the specific age of the rib fracture, the evidence suggested that it occurred at least one week prior to the victim's hospitalization. The jury heard all of the testimony and could reasonably conclude that defendant caused the rib fracture when he dropped her down the stairs.

### III.

We reject defendant's argument that the judge should have instructed the jury that it could not consider evidence of the victim's arm and leg fractures unless it found that those fractures were inflicted at the time of the brain injury.

Defendant had argued that the evidence of the arm and leg fractures were inadmissible under N.J.R.E. 404(b), and he moved to exclude that evidence, for a mistrial, and for a new trial. The judge admitted this evidence, however, based on the State's theory of the case that the victim's arm and leg fractures occurred at the same time as her brain injury and, therefore, were intrinsic to the charged offenses. The judge reasoned that those fractures "while uncharged, are part and parcel of the State's allegation of [s]haken [b]aby [s]yndrome," and according to the State would "directly prove the charged offense and/or be performed

21

contemporaneously with" or facilitate the charged crime. The judge stated that the connection of the arm and leg fractures to the charged crime was a question of fact for the jury and, that it would not be unduly prejudicial under the facts of the case for the jury to consider the evidence.

Defendant acknowledged, however, that details about the fractures on the victim's arms and legs were intrinsic evidence and that it "was a permissible basis to admit evidence of these fractures." But he asserts that the possibility that the evidence might be intrinsic, rather than evidence of other crimes admissible under Rule 404(b), "did not relieve the [judge] of its obligation to provide a limiting instruction" and the failure to do so unduly prejudiced him.

Because defendant did not request a limiting instruction, we review his contentions for plain error. R. 2:10-2. See also State v. Cole, 229 N.J. 430, 455-56 (2017) (finding no plain error where a trial court did not sua sponte charge a jury with limiting instructions). Additionally, Rule 1:7-2 states that "no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict[.]" Although the Supreme Court recognizes "the ordinary reluctance of reviewing courts to reverse on the grounds of plain error when no objection to a charge has been made," the Court has "repeatedly emphasized that incorrect

22

instructions of law are poor candidates for rehabilitation under the harmless error theory." State v. Weeks, 107 N.J. 396, 410 (1987).

Proper instructions are essential to a fair trial. State v. Green, 86 N.J. 281, 287 (1981). If evidence of other crimes is admitted under Rule 404(b), the trial court should issue a limiting instruction, even if the defense does not request a limiting instruction. State v. Clausell, 121 N.J. 298, 323 (1990). See also Agha v. Feiner, 198 N.J. 50, 63 n.7 (2009) (stating that "[e]ven in the absence of a request, the judge should give a limiting instruction sua sponte where it is necessary to avoid an unjust result").

Nevertheless, when a court is "reviewing any claim of error relating to a jury charge, the 'charge must be read as a whole in determining whether there was any error,' and the effect of any error must be considered 'in light of the overall strength of the State's case.'" State v. Gonzalez, 444 N.J. Super. 62, 70-71 (App. Div. 2016) (first quoting State v. Torres, 183 N.J. 554, 564 (2005), then quoting State v. Walker, 203 N.J. 73, 90 (2010)). If an error regarding the jury charge is harmless and there is "no indication that the jury was misled by the error," then the jury charge may not warrant a reversal. State v. Docaj, 407 N.J. Super. 352, 369 (App. Div. 2009).

A-0407-16T4

Even if evidence constitutes "uncharged misconduct that would normally fall under Rule 404(b)," if it is "intrinsic to the charged crime [it] is exempt from the strictures of Rule 404(b) . . . because it is not evidence of other crimes, wrongs, or acts." State v. Rose, 206 N.J. 141, 177 (2011) (citation and internal quotation marks omitted). Rather, intrinsic evidence need only satisfy the Rule 403 balancing test and the relevancy evidence rules. Id. at 177-78. Rule 403 permits relevant evidence "unless its probative value is substantially outweighed by a negative feature of the evidence[.]" Id. at 178. See also State v. Santamaria, ___ N.J. ___ (2019) (slip op. at 23) (stating that "if evidence is found to be intrinsic to the crime at issue, it does not constitute other-acts evidence and is subject only to the limits of Rule 403").

To determine if evidence is "intrinsic," our Supreme Court adopted the test articulated in United States v. Green, 617 F.3d 233, 248 (3d Cir. 2010), which limits intrinsic evidence to "two narrow categories of evidence." Rose, 206 N.J. at 180; State v. Brockington, 439 N.J. Super. 311, 327 (App. Div. 2015). "The first category applies to evidence that 'directly proves' the charged offense," and the "operative factor is whether the evidence has probative value as to the charged offense." Brockington, 439 N.J. Super. at 327. The second category defines intrinsic evidence as "uncharged acts performed

contemporaneously with the charged crime [that] . . . facilitate the commission of the charged crime." Rose, 206 N.J. at 180.

The judge admitted the arm and leg fracture evidence as intrinsic evidence because he found the State presented those uncharged acts as part and parcel to the charged crime, and as direct proof of the charged crime. Defendant also acknowledged that this evidence was properly admitted as intrinsic evidence. Therefore, it was "exempt from the strictures of Rule 404(b)" and did not require a limiting instruction. Rose, 206 N.J. at 177.

IV.

Defendant asserts for the first time that the doctor who treated the victim at the hospital improperly testified as an expert—even though the State called him as a fact witness—without being qualified as such, and that his testimony went to the ultimate issue of the case—that the victim was abused. Defendant argues that the judge erred by not issuing "adequate instructions on how to evaluate [the doctor's] opinions." Defendant contends therefore that he received an unfair trial.

We review evidentiary rulings for abuse of discretion. State v. Feaster, 156 N.J. 1, 82 (1998). A trial court's evidentiary ruling must be upheld unless the appellant shows that the court's "finding was so wide of the mark that a

manifest denial of justice resulted." State v. Carter, 91 N.J. 86, 106 (1982). Additionally, when there is no objection (like here), we usually disregard an error not raised unless we find plain error—that is, error that is "clearly capable of producing an unjust result." R. 2:10-2. This possibility of "an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Williams, 168 N.J. 323, 336 (2001) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). Moreover, "no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict[.]" R. 1:7-2.

Courts distinguish between expert witnesses and treating physicians because "[u]nlike an expert retained to testify at trial, the treating doctors gained no confidential information about plaintiffs' trial strategy." Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 313-14 (1995). Our Supreme Court has stated that "[s]ubject to the notice and discovery requirements of our court rules and the requirements of [Rule] 701 and other Rules of Evidence, our case law authorizes a trial court to admit the testimony of a treating physician regarding the diagnosis and treatment of a patient." Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 563 (2016). The treating physician's testimony is, nonetheless,

"subject to an important limitation." Id. at 579. That is, "[u]nless the treating physician is retained and designated as an expert witness, his or her testimony is limited to issues relevant to the diagnosis and treatment of the individual patient." Ibid.

While treating physicians "are doubtless 'experts,'" they are "more accurately fact witnesses" where "[t]heir testimony relates to their diagnosis and treatment" of the patient. Stigliano, 140 N.J. at 314. A physician's determination of the cause of a condition "partakes of both fact and opinion," and the "critical point is that the treating doctors to treat their patients must determine the cause of a disease, whether that determination is characterized as fact or opinion." Ibid. Accordingly,

> [a]s fact witnesses, the treating doctors may testify about their diagnosis and treatment of [an injury], including their determination of that [injury's] cause. Their testimony about the likely and unlikely causes of [a patient's injury] is factual information, albeit in the form of opinion. Because the determination of the cause of a patient's illness is an essential part of diagnosis and treatment, a treating physician may testify about the cause of a patient's disease or injury.
>
> [Ibid. (citation omitted).]

Here, the doctor treated the victim for her cardiac arrest, fractures, and related injuries, the causes of which were relevant to his diagnosis and treatment.

27

His personal observations, diagnosis, and testimony about potential causes of the victim's injuries, as a treating physician, have been explicitly approved by the Court, as long as it is in accordance with the notice and discovery requirements and the rules of evidence.  See Delvecchio, 224 N.J. at 563; Stigliano, 140 N.J. at 314.

The doctor testified consistently with Rule 701, which permits his "opinions or inferences" that are "(a) rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue."  In diagnosing and treating the victim's injuries, and in concluding that there were multiple signs leading to abuse, he referred— without objection—to the victim's lungs and heart "explod[ing]" and "sw[e]ll[ing]," the amount of "pulmonary edema [that existed] afterward," the "blood on [her] brain," the "massive retinal hemorrhages," and the amount of bleeding behind her eyes.  The doctor's fact-witness testimony did not usurp the jury's function, opine about defendant's guilt or innocence, or bolster the testimony from other witnesses.

V.

Finally, defendant argues that the sentencing judge erred by imposing consecutive sentences, which he contends is excessive.  She sentenced defendant

28

to eight years in prison on Count One, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On Count Four, she imposed a consecutive eight-year prison term. The aggregate prison term was sixteen years in prison, subject to the NERA imposition on Count One.

An appellate court applies "a deferential standard of review to the sentencing court's determination, but not to the interpretation of a law." State v. Bolvito, 217 N.J. 221, 228 (2014). "Appellate review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). An appellate court may not "substitute [its] judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014).

The sentencing judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (risk of reoffending); six, N.J.S.A. 2C:44-1(a)(6) (prior record); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter). She found no mitigating factors and concluded that the aggravating factors substantially outweighed the non-existent mitigating factors.

The sentencing judge imposed consecutive sentences in accordance with State v. Yarbough, 100 N.J. 627, 643 (1985). Five factors that a court should

consider in determining whether to impose a concurrent or consecutive sentence are:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous.
>
> [State v. Molina, 168 N.J. 436, 441-42 (2001) (quoting Yarbough, 100 N.J. at 644).]

These factors "should be applied qualitatively, not quantitatively." State v. Carey, 168 N.J. 413, 427 (2001). As to the imposition of consecutive sentences, she stated:

> Crimes committed by [defendant] occurred on wholly separate and distinct dates. Count One and Two pertain to an incident that took place on February 16[,] 2012. Count Four, endangering the welfare of a child, took place on February 10[,] 2012. This is a wholly separate and distinct act for which [defendant] was convicted. . . . [T]hese are separate and distinct crimes. They are independent of each other, . . . [the] [c]rimes and their objectives on each of these dates were

independent. They involved separate acts and the crimes were committed at different times and different places.

There are three offenses for which [defendant was] found guilty. Thus, the [c]ourt find[s] consecutive sentences are appropriate as to some of the crimes for which [defendant is] being sentenced.

We are satisfied that in applying the sentencing guidelines, the judge gave adequate reasons to support the sentence, the sentence is not manifestly excessive or unduly punitive, and it does not constitute an abuse of discretion. See State v. Fuentes, 217 N.J. 57, 70 (2014); State v. Cassady, 198 N.J. 165, 180-81 (2009); State v. Roth, 95 N.J. 334, 362-63 (1984).

We conclude that defendant's remaining arguments—to the extent that we may not have addressed them—are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

31

A-0407-16T4