**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3766-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RODNEY GREEN, a/k/a
TYRONE GREEN, RODNEY
SMITH, DARRYL MILES,
FRANK THOMAS, FRANK
WHITE, MILES GREEN,
RODNEY SMITH and
RODNEY GRAHAM,

    Defendant-Appellant.

_____

> Submitted on January 6, 2026 – Decided April 29, 2026
>
> Before Judges Sumners, Susswein and Augostini.
>
> On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 20-12-0501.
>
> Jennifer N. Sellitti, Public Defender, attorney for appellant (Alison Gifford, Assistant Deputy Public Defender, of counsel and on the briefs).

Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Kimberly P. Will, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Rodney Green of second-degree robbery, N.J.S.A. 2C:15-1(a)(2), and he was sentenced as a persistent offender to fifteen years in prison with an eighty-five percent parole ineligibility term and three-year parole supervision pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant appeals from his conviction and sentence. Having reviewed his contentions in light of the record and applicable law, we reverse and remand for a new trial.

## I.

We discern the facts from the trial record. Between September 26 and September 29, 2020, defendant was hospitalized due to back pain, referred to as "flank pain." Around 6:30 p.m. on September 29, he left the hospital against medical advice. Later that evening, he entered a pharmacy in Millville, approached the cashier, and demanded money or he would kill her and everyone in the store. The cashier turned over the money, which included "tracking money" described as a roll of bills with a GPS tracker placed in between the

bills.  Defendant was located that evening in a wooded area near the pharmacy and arrested.

At trial, the State presented testimony from five witnesses: the pharmacy cashier and shift supervisor Belinda Dority; assistant store manager, Robert Kinzel; Millville law enforcement officers:  Sergeant Brandon Kavanagh, Officer Louis Torres, and Officer Rodney Yamasaki.  The State introduced various surveillance footage from the pharmacy and body-worn camera footage from some of the officers.

Defendant elected not to testify, but called two witnesses:  Dr. Shannon Harrington, one of the hospital's treating physicians, and Zakiya Mutcherson, a hospital case manager.  Defendant's medical records from his hospital stay were admitted.

Dority testified that at about 10:30 p.m. on September 29, an individual approached the register and told her to "give him all the money in the register or he was going to kill [her] and everyone in there."  She explained that at first, she did not take him seriously although, "at the same time," she was trying to get the security guard's attention who was standing in a nearby aisle.  In response, defendant stated, "I see you're trying to get your people.  I'm not

playing. I will kill you and everyone in here. Give me the money." Dority then handed him the money, and he left the store.

Dority felt "kind of scared because [she] didn't know whether or not . . . he was on drugs [or] had any . . . hypodermic needles." Dority acknowledged that defendant did not brandish a weapon while demanding money.

Robert Kinzel, the assistant store manager, testified that as he entered the store that evening to begin his shift, he passed defendant leaving the store. Kinzel confirmed that the store had surveillance cameras both inside and outside. On the evening of the incident, he burned the surveillance footage from the various cameras for the officers. Kinzel identified a total of five surveillance videos. He explained that the first video showed the "exterior side lot camera," and captured people entering the store, including defendant. Kinzel identified another video from inside the store, showing the entrance, and other videos showing the store registers, which also included defendant standing at Dority's register.

After defendant left the pharmacy with the money, the police were contacted. They arrived shortly thereafter and began searching the area. Sergeant Kavanagh testified that defendant was found in a "thick, overgrown area . . . . pretty close" to the pharmacy. Officer Torres searched defendant,

4

finding "rubber-banded money" inside his pocket. Although Kinzel testified that $244 was missing from the register, only $161 was found on defendant. The parties stipulated that no other money was found in the area. According to Torres, after being arrested, defendant, who had a "hospital band" on his wrist, was able to answer questions, although he seemed "jittery" and unfocused at times. After being processed, defendant was taken back to the hospital for further treatment.

Defendant called Dr. Shannon Harrington, his treating physician during his hospital stay, to testify. Prior to trial, the court conducted oral argument on the State's motion in limine to bar expert testimony because no expert report had been provided. The State acknowledged, however, that defendant's medical records had been produced. The court granted the State's motion in part, barring "[a]ll expert testimony" but permitting "[t]estimony regarding defendant's hospital records and any known side effects of the prescribed medications."

Dr. Harrington testified that defendant came to the emergency room complaining of flank pain, which she explained refers to "pain on the lateral side of the abdomen." Defendant was also "diagnosed with hypocalcemia and hypokalemia." Dr. Harrington testified that the "working diagnosis" for flank pain was "Loin Pain Hematuria Syndrome." Defendant was admitted to the

hospital on September 26. Dr. Harrington testified that she saw defendant on September 29, and noted in the medical chart, "[p]atient not medically stable for discharge at this time." Nonetheless, defendant left the hospital on that day against medical advice.

Dr. Harrington testified regarding the medications defendant received for pain, which included narcotic and non-narcotic medications. Specifically, defendant received benzodiazepine and opioid medications during his three-day hospital stay. After seeing defendant, Dr. Harrington concluded that defendant's pain was not being controlled, so she converted the pain medication to "a basal amount of pain medication" administered through an IV as a means to "potentially increase the pain medication[']s" efficacy. Dr. Harrington testified to some of the "published" side effects of these medications, which included "respiratory depression . . . sedation, . . . [and] altered mental status."

The final defense witness, Mutcherson, testified regarding the discharge planning meeting she had with defendant on September 28. According to Mutcherson, defendant stated he would need a bus ticket or some form of transportation to get home. At this meeting, Mutcherson described defendant's demeanor as "[a]ppropriate, calm and cooperative."

A-3766-23

After deliberating, the jury convicted defendant of second-degree robbery. Before sentencing, the court conducted oral argument on defendant's motion for a new trial. Defendant argued that he was "denied the opportunity to be provided with an expert to substantiate [his] intoxication pathological defense." Defendant contended that he was prejudiced by the "absence of [] expert testimony." The court denied defendant's motion and granted the State's motion for a discretionary extended term as a persistent offender.

On December 5, 2023, the court sentenced defendant to fifteen years imprisonment subject to the parole disqualifier and supervision requirements of NERA.

Defendant raises the following points for our consideration:

> POINT I
> THE TRIAL COURT'S ERRONEOUS EXCLUSION OF TESTIMONY THAT WENT TO THE HEART OF [DEFENDANT]'S INVOLUNATRY INTOXICATION DEFENSE DEPRIVED HIM OF A FAIR TRIAL.
>
> A. The Trial Court's Decision Barring Any Expert Testimony On [Defendant]'s State Of Mind At The Time Of The Offense Deprived Him Of A Fair Trial.
>
> B. The Trial Court's Exclusion Of Testimony Regarding The Side Effects Of The Combination Of Benzodiazepines And Opioids Deprived [Defendant] Of A Fair Trial.

7

A-3766-23

POINT II
THE STATE ELICITED INADMISSABLE LAY OPINION TESTIMONY FROM THE [PHARMACY] STORE MANAGER REGARDING WHAT THE SURVEILLANCE SHOWED, WHICH IMPERMISSIBLY BOSTERED THE STATE'S THEORY THAT [DEFENDANT] COMMITTED A ROBBERY.

POINT III
THE COURT'S STATEMENT THAT [DEFENDANT] COULD BE IMEPACHED WITH ALL OF HIS PRIOR CONVICTIONS WAS CONTRARY TO RULE 609(B) AND COULD HAVE PREVENTED [DEFENDANT] FROM TESTIFYING ON HIS OWN BEHALF, THUS DEPRIVING HIM OF A FAIR TRIAL.

POINT IV
THE CUMULATIVE IMPACT OF THE ERRORS DENIED [DEFENDANT] DUE PROCESS AND A FAIR TRIAL.

POINT V
RESENTENCING IS REQUIRED BECAUSE: A) SENTENCING [DEFENDANT] TO AN EXTENDED TERM AS A PERSISTENT OFFENDER VIOLATED HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS: AND B) THE TRIAL COURT FAILED TO EXPLAIN THE REASONS FOR THE SENTENCE IMPOSED.

A. Sentencing [Defendant] To An Extended Term As A Persistent Offender Violated His Fifth, Sixth, and Fourteenth Amendment Rights.

8

### B. The Trial Court Failed to Explain The Reasons For The Sentence Imposed.

Having reviewed the record and governing law, we reverse defendant's conviction for two reasons. First, the trial court erred by barring any opinion testimony from the hospital treating physicians. Second, the trial court erred in advising defendant that any of his prior convictions could be used to impeach him if he decided to testify. Moreover, these errors were cumulative and, in combination, deprived defendant of a fair trial.

## II.

### A. Expert Opinion

We first address defendant's argument that the trial court erred by excluding the treating physician's opinion about defendant's condition on the date of the incident or thereafter thus depriving him of a fair trial. Defendant also contends that the court unduly restricted his treating physician's testimony on the central element of the offense—his mens rea—and those improper limitations undermined defendant's involuntary intoxication defense.

We begin our analysis with the governing legal principles for the admission of expert testimony and lay opinion. The admissibility of expert testimony is a matter left to the trial court's sound discretion. Townsend v. Pierre, 221 N.J. 36, 52 (2015). We will not "substitute [our] own judgment for

that of the trial court, unless the trial court's ruling was so wide of the mark that a manifest denial of justice resulted." State v. Singh, 245 N.J. 1, 13 (2021) (quoting State v. Brown, 170 N.J. 138, 147 (2001) (last citation and internal quotation marks omitted)). "A trial court's 'discretion is abused when relevant evidence offered by the defense and necessary for a fair trial is kept from the jury.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting State v. Cope, 224 N.J. 530, 554-55 (2016)).

N.J.R.E. 701 provides for the admission of lay opinion testimony:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> (a) is rationally based on the witness' perception; and
>
> (b) will assist in understanding the witness' testimony or determining a fact in issue.

"[I]n a variety of circumstances, see [Neno v. Clinton, 167 N.J. 573, 582 (2001)], [] '[a] lay witness may give an opinion on matters of common knowledge and observation.'" State v. Bealor, 187 N.J. 574, 586 (2006) (quoting State v. Johnson, 120 N.J. 263, 294 (1990) (citation omitted)). One such circumstance arises when a treating physician testifies "regarding the diagnosis and treatment of a patient." Delvecchio v. Township of Bridgewater, 224 N.J. 559, 563 (2016) (citing Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 314 (1995)).

10

Under N.J.R.E. 701, treating physicians are permitted to testify about their "observations, diagnosis and treatment" even when they are not testifying as expert witnesses. Delvecchio, 224 N.J. at 578. A treating physician who testifies regarding "their observations, diagnosis and treatment" of their patient is "offering [both] factual evidence and opinion evidence governed by N.J.R.E. 701." Ibid., (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 4 on N.J.R.E. 701 (2015)). As the New Jersey Supreme Court recognized, under certain circumstances, "the characterization of the treating doctors' testimony as 'fact' or 'opinion' creates an artificial distinction." Stigliano, 140 N.J. at 314. Indeed, to testify about a patient's diagnosis and treatment, the doctor's testimony "partakes of both fact and opinion." Ibid. Therefore, a properly qualified treating physician may be permitted to testify more as a hybrid fact-expert witness.

At a pretrial hearing on August 16, 2022, the court stated that Dr. Harrington, or any testifying treating physician, would not be permitted to give any opinion testimony because defendant had not identified the treating physicians as experts and no expert report had been submitted. However, defendant's medical records had been turned over prior to trial.

The court explained:

> They can testify as to . . . why they gave him the drug.
> They can testify as to how the drug affected him, from
> their observations.  But they're not going to opine about
> what those drugs could do; you understand?

In the August 24, 2022 order, the court barred "[a]ll expert testimony," and limited the medical testimony to "defendant's hospital records and any known side effects of the prescribed medications."

At the outset of Dr. Harrington's direct testimony, the court reiterated its ruling barring any opinion testimony, stating, "[j]ust keep it to the facts, keep opinion out of it and I don't see any issues."  The court further stated that Dr. Harrington,

> [] is purely a fact witness.  She's just communicating
> basically the basics from the medical records as to the
> length of the visit, what he was there for, what
> treatment he received.

When counsel asked the doctor to describe flank pain, the court sua sponte reminded counsel that this is "exactly the type of question you can't ask."  The court limited the questioning to "how [] the flank plain manifest[ed] itself, according to the records[.]" Counsel was also prohibited from asking Dr. Harrington to define loin pain.  In response to counsel's question, the court responded:

12

No, you shouldn't be doing that.  Her opinion as to what loin pain is may be different from some other doctor's opinion as to loin pain.

The court erred in unduly restricting the doctor's testimony in this manner.  Dr. Harrington, as a treating physician, could properly testify concerning defendant's diagnosis and treatment during his hospitalization.  Such testimony may include opinion testimony in the form of an explanation of the presenting complaints and diagnosis.  Stigliano, 140 N.J. at 314 (A treating physician may testify about the cause of a patient's disease or injury and that testimony, while factual, may be in the form of opinion).

The court further erred by prohibiting Dr. Harrington from testifying regarding the side effects of "any particular drug" and "whether or not [the doctor] think[s] that [a person] . . . could have suffered from" those side effects. The court explained further that any testifying doctor could only "testify to . . . any side effect that they actually observed."  Initially, the court permitted Dr. Harrington to testify as to the "side effects of benzos and opioids," but later,  the court sustained an objection when asked if these medications "can [] also impair a person's judgment[.]"  The court then ruled that Dr. Harrington could only testify as to any "published side effects," stating she could only "refer to those side effects that are identified by the manufacturer."

During the trial, Dr. Harrington testified to the medications defendant received on September 29, noting that the last medication was given to him at 4:58 p.m. Those medications included opioids as well as benzodiazepines. When asked on direct if she believed defendant was "not medically fit to be discharged at that time she saw him" on September 29, the court initially sustained an objection to this question. However, the court permitted Dr. Harrington to read from the medical records in the addendum, which noted that defendant was not fit to be discharged.

These conflicting limitations unduly constrained defendant's treating physician from testifying regarding his diagnosis and the treatment he received, which included both narcotic and non-narcotic medications. Subject to discovery requirements, which may include a summary of an expert's findings, Rule 3:13-3(b)(1)(I), a treating physician may offer "testimony in the form of opinions or inferences" provided the testimony is "rationally based on the perception of the witness" and "will assist in understanding the witness' testimony or in determining a fact in issue." Delvecchio, 224 N.J. at 576-77 (quoting N.J.R.E. 701).

Here, Dr. Harrington's testimony, including her testimony concerning defendant's chief complaint of flank pain and diagnosis of loin syndrome and

14

the medications prescribed to treat his pain, was well within the scope of N.J.R.E. 701. Said another way, Dr. Harrington's opinion testimony, which the court prohibited, was rationally based on her perceptions as defendant's treating physician and would have assisted the jury in understanding her testimony and determining whether defendant had the requisite mens rea to commit the offense charged. In restricting the doctor's testimony in this fashion, the court misapplied its discretion thereby effectively preventing defendant from asserting the intoxication defense.

### B. The Use of Defendant's Prior Convictions

We turn next to defendant's argument that the court erred when it incorrectly advised him that he could be impeached with any of his prior convictions. Defendant contends the court's misstatement was contrary to N.J.R.E. 609, "could have impacted [defendant's] decision to testify," and because the case hinged on his state of mind, "the court's error was clearly capable of producing [an] unjust result." Defendant avers that had the court engaged in the proper Rule 609(b) analysis, "none of [his] prior convictions would have been admissible to impeach him."

N.J.R.E. 609 governs the use of prior convictions to impeach the credibility of a witness. The rule provides that "the witness's conviction of a

15

crime, subject to Rule 403, shall be admitted unless excluded by the court pursuant to paragraph (b) of this rule."  N.J.R.E. 609 (b)(1):

> provides that if, at the time of trial, over [ten] years have passed since the conviction or the witness's release from confinement for that conviction, whichever is later, the conviction 'is admissible only if the court determines that its probative value outweighs its prejudicial effect, with the proponent of that evidence having the burden of proof.
>
> [State v. Higgs, 253 N.J. 333, 368 (2023).]

The New Jersey Supreme Court "declared that '[t]he key to exclusion is remoteness' but also noted that '[r]emoteness cannot ordinarily be determined by the passage of time alone.'"  Ibid. (alteration in original) (citing State v. Sands, 76 N.J. 127, 144 (1978)).

In making an admissibility determination under N.J.R.E. 609(b), the court first conducts a Sands/Brunson hearing.  Ibid. (citing Sands, 76 N.J. 127; State v. Brunson, 132 N.J. 377 (1993)).  Under N.J.R.E. 609(b)(2), a court may consider:

> (i) whether there are intervening convictions for crimes or offenses, and if so, the number, nature, and seriousness of those crimes or offenses,
>
> (ii) whether the conviction involved a crime of dishonesty, lack of veracity or fraud,
>
> (iii) how remote the conviction is in time, [and]

(iv) the seriousness of the crime.

"The court must then engage in the weighing process under [N.J.R.E. 609(b)(1)], to determine whether the State has carried its burden of proving that evidence of the remote conviction would not be more prejudicial than probative." State v. Hedgespeth (Hedgespeth I), 464 N.J. Super. 421, 431 (App. Div. 2020) (quoting State v. R.J.M., 453 N.J. Super. 261, 270 (App. Div. 2018)).

We use an abuse of discretion standard in reviewing a trial court's decision to admit a defendant's prior convictions. Higgs, 253 N.J. at 367 (citing State v. Hedgespeth (Hedgespeth II), 249 N.J. 234, 250 (2021)). However, "we do not defer to a ruling that is based on a mistaken interpretation of an evidence rule, or that misapplies the rule." Hedgespeth I, 464 N.J. Super. at 430 (quoting R.J.M., 453 N.J. Super. at 266).

On the first day of trial, defendant raised the issue of using a prior conviction for impeachment purposes against one of the State's witnesses. In addressing this, albeit different, issue, the court noted that "if [] [d]efendant is going to testify, there will have to be a [Sands/Brunson][1] [hearing]."

Then, as the State's case came to a close, the court questioned defendant regarding his right to testify:

---

[1] Sands, 76 N.J. at 127; Brunson, 132 N.J. at 377.

A-3766-23

THE COURT: We're reaching the end of the State's case and in a few minutes when they rest, it will be the defense's or your opportunity to present evidence to the jury in this case. Do you understand, sir?

[DEFENDANT]: Yes, sir.

THE COURT: Part of that is the potential that you would testify in this case. Do you understand?

[DEFENDANT]: Yes, sir.

THE COURT: Okay. Now, if [] the decision of whether you testify or not is completely your own. You do it in consultation with your attorney. You understand, sir?

[DEFENDANT]: Yes, sir.

THE COURT: Now, if [] you have the right to not testify and so if you decide not to testify, there's another decision you have to make, which I'm going to go over with you in a minute.

Now, if you do decide that you're going to testify, you should understand that <u>the Prosecutor will be permitted to explore in front of the jury any prior offenses for which you have been convicted.</u> Do you understand, sir?

[DEFENDANT]: Okay.

THE COURT: Okay? That's something you could consider in making your determination. I'm sure you'll have those conversations with your attorney. <u>And they may consider your prior convictions as being on your credibility</u>, along with other – all other factors on credibility.

> And I will instruct them that they cannot consider your prior convictions as evidence of predisposition to commit an offense. Do you understand, sir?
>
> [DEFENDANT]: (No audible response)
>
> THE COURT: They can only do it for the purposes of credibility; all right?
>
> [DEFENDANT]: (No audible response)
>
> [(Emphasis added).]

Defendant did not request a ruling on the admissibility of his prior convictions, nor did the court conduct a Sands/Brunson hearing on whether his prior convictions would be admitted if he chose to testify. The State contends that "the issue of [defendant's] prior convictions' admissibility simply never came up," and nothing in the record indicates that defendant would have testified. Nonetheless, it is not disputed that all of defendant's eleven prior convictions were over ten years old. Therefore, under Rule 609(b)(1), those convictions would have been admissible "only if the court determine[d] that [their] probative value outweigh[ed] [their] prejudicial effect, with the proponent of that evidence having the burden of proof." N.J.R.E. 609(b)(1) (emphasis added); see also Higgs, 253 N.J. at 368-71. In other words, the rule "creates a presumption that a conviction more remote than ten years is inadmissible for impeachment purposes, unless the State carries the burden of

19

proving 'that its probative value outweighs its prejudicial effect.'" Hedgespeth I, 464 N.J. Super. at 431 (quoting R.J.M., 453 N.J. Super. at 266-67). The court did not explain nor undertake this analysis, but rather, misadvised defendant by oversimplifying this important consideration.

The State argues that this alleged error should be reviewed under the plain error standard because defendant did not object to the court's incorrect statement. We are not persuaded by this argument. The trial court's statement was clearly erroneous, and while impactful, it was not a formal ruling likely to prompt an objection for purposes of invoking the plain error standard of review.

The State further contends that at sentencing, defendant stated he did not remember that evening except for "some officers all around me, waking me up off the ground." Thus, defendant could not have refuted the robbery nor explained his state of mind; and any error relative to the court's misstatement was harmless.

The trial court mistakenly advised defendant that any of his convictions would be used to impeach his credibility if he decided to testify. Thereafter, defendant elected not to testify. The court's statement was a misreading of N.J.R.E. 609(b) and our case law regarding the admissibility of prior convictions. See Sands 76 N.J. at 127; Brunson, 132 N.J. at 377; Hedgepath,

249 N.J. at 234; Higgs, 253 N.J. at 333. Defendant's most recent conviction for fourth-degree joyriding dated back to 2011, for which he was sentenced to eighteen months incarceration. Before that, defendant was convicted in 2008, for third-degree conspiracy to possess CDS and was sentenced to one-year probation. At the time of defendant's trial in 2022, his most recent convictions were eleven and fourteen years ago.

This case hinged on defendant's culpable mental state. The key disputed issue at trial was whether the State proved beyond a reasonable doubt that defendant acted purposefully or knowingly, that is, that he harbored the mental culpable state required to convict for robbery. Defendant does not contest that he entered the pharmacy and stole money from the cashier. He claims, however, that due to his involuntary intoxication stemming from the various narcotics he received while hospitalized, he did not act purposefully or knowingly. Said differently, defendant contended that he was intoxicated by prescription medications "so as [] not [to] know the nature of and quality of what he was doing, or if he did know it, that he did not know that what he was doing was wrong, and that the intoxication was not self-induced."

During his motion for a new trial, defendant contended that when he was arrested following the incident, he was woken up off the ground by the officers.

21

The State, however, did not offer the officer's body-cam video. Thus, defendant's testimony regarding his lack of memory except for being woken up by the officers, may have "influenced the outcome" of defendant's trial on the issue of intent. See R.J.M., 453 N.J. Super. at 271; (citing R. 2:10-2; State v. Scott, 229 N.J. 469, 483-84 (2017); State v. Murphy, 412 N.J. Super. 553, 561 (App. Div. 2010)). As our Supreme Court has explained, the "[e]xclusion of testimony, however, which is central to a defendant's claim or defense, 'if otherwise admissible, cannot be held to be harmless error.'" Scott, 229 N.J. at 484 (2017) (quoting State v. Kelly, 97 N.J. 178, 202-03 (1984)).

"Ordinarily, we review a trial court's evidentiary rulings for abuse of discretion." R.J.M., 453 N.J. Super. at 266. However, "a ruling based on mistaken interpretation of an evidence rule, or that misapplies the rule" is not entitled to such deference. Ibid.

Although the trial court did not make a formal "ruling" on the use of defendant's prior convictions, it misadvised defendant on an important consideration in balancing the benefits and risks of his decision whether or not to testify on his own behalf. The trial court erred by generalizing the use of defendant's remote convictions in such a manner that it neglected to explain the robust analysis that must be undertaken to "determine whether the State ha[d]

22

carried its burden of proving that evidence of remote conviction would not be more prejudicial than probative." Id. at 270 (citing N.J.R.E. 609(b)(1)).

By advising defendant that the State could use any of his prior convictions against him for impeachment purposes if he elected to testify, the court oversimplified the required Sands/Brunson analysis. The court's truncated explanation of the use of his prior convictions may have chilled defendant's right to testify, or at a minimum, improperly influenced his decision not to testify. In this context, we cannot conclude that the court's erroneous statement was harmless error.

### C. Cumulative Effect of the Errors

"[I]f the combined effect of multiple errors deprives a party of a fair trial, an appellate court should order a new trial." State v. Burney, 255 N.J. 1, 29 (2023) (alteration in original) (quoting Torres v. Pabon, 225 N.J. 167, 191 (2016) (citation omitted)). If there is a strong probability that the combination of errors resulted in an unfair trial, "cast[ing] sufficient doubt on a verdict," a new trial is warranted. Torres, 225 N.J. at 191, (quoting State v. Jenewicz, 193 N.J. 440, 473 (2008)).

Defendant contends that the cumulative effect of the trial court's errors, including Kinzel's improper narration of the surveillance footage depicting

defendant as planning the robbery, weakened his involuntary intoxication defense, and deprived him of a fair trial.

When faced with the decision whether or not to testify, defendant had already been prejudiced by the court's preclusion of any opinion testimony from his treating physician. That error was then compounded by the trial court's erroneous statement concerning the State's use of any of defendant's prior convictions. The court's oversimplification of the Sands/Brunson analysis may have had a direct impact on defendant's decision not to testify, and his testimony may have provided important evidence in support of his involuntary intoxication defense.

We hold that these errors in combination struck at the heart of defendant's defense, undermining his involuntary intoxication defense. The court's error in precluding any opinion testimony from defendant's treating physician combined with its misstatement regarding the use of his remote convictions are sufficient to raise a reasonable doubt about the fairness of defendant's trial. We are satisfied that these errors demonstrate that defendant should receive a new trial.

Consequently, we reverse defendant's conviction. Given this holding, we need not address defendant's remaining alleged trial error that the pharmacy store manager gave improper lay opinion testimony regarding the surveillance

24

footage. Nor do we need to reach the sentencing issue. This matter is remanded for a new trial or further proceedings.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3766-23